521 F.Supp. 342 (1981)
OPE SHIPPING, LTD., and El Porvenir Shipping Co., Inc., Plaintiffs,
v.
ALLSTATE INSURANCE COMPANY, INC., United States Fidelity & Guaranty Companies, Inc., Various British Underwriters and Underwriters at Lloyds, Defendants.
VADOR SHIPPING, LTD., and Cia De Navagacion La Libertad, S. A., Plaintiffs,
v.
ALLSTATE INSURANCE COMPANY, INC., et al., Defendants.
AGUA SHIPPING, LTD., and Cia De Navagacion Corinto, S. A., Plaintiffs,
v.
ALLSTATE INSURANCE COMPANY, INC., et al., Defendants.
DURAS SHIPPING, LTD., and Marina Mercante Nicaraguense, S. A., Plaintiffs,
v.
ALLSTATE INSURANCE COMPANY, INC., et al., Defendants.
Nos. 79 Civ. 5225-5228(MP).
United States District Court, S. D. New York.
August 31, 1981.
*343 Cichanowicz & Callan, New York City, by Victor S. Cichanowicz, New York City, for plaintiffs.
Hill, Betts & Nash, New York City, by Michael J. Ryan, Frank Loomis, Gregory O'Neill, New York City, for defendants Marine Risk Underwriters.
Mendes & Mount, New York City, by Brendan J. Connolly, New York City, for defendants War Risk Underwriters.
MILTON POLLACK, District Judge.

FINDINGS AND OPINION
These are admiralty actions seeking recovery from "Marine" and "War Risk" underwriters of the agreed insured value of four commercial vessels which plaintiffs contend and defendants dispute were lost as the result of perils covered by the policies of insurance issued on those vessels. The case was tried to the Court at a Bench trial.
The vessels belonged to General Anastasio Somoza Debayle who carried the title thereto in the names of three wholly-owned Panamanian and one Nicaraguan corporation; all were registered under the Nicaraguan flag until about July 10, 1979. On or about that date Somoza caused the transfer of the nominal title from the three Panamanian and the Nicaraguan corporations to four corporations chartered in the Cayman Islands. The Panamanian, Nicaraguan and Cayman Islands corporate title holders to the vessels respectively are plaintiffs herein.
The defendants are two separate groups of underwriters. The "Marine Risk" underwriters are Allstate Insurance Company, Inc. (50%); United States Fidelity and Guarantee Company, Inc. (25%); and Various Underwriters at Lloyd's and British Companies (25%); and the "War Risk" underwriters are described herein as Various Underwriters at Lloyds (100%).
Both the marine and war risk policies commenced on May 15, 1979 and were to run for one year. The Allstate policy terminated on July 6, 1979 for non-payment of premiums. The other marine risk policies terminated on July 10, 1979 because of the transfer of the corporate title to the ships. The war risk insurers authorized the assignment of the war risk policy to the Cayman Islands corporations holding the title to the ships. The Cayman Islands corporations were not named in any marine policy issued by any of the defendants. Each vessel was insured at an agreed value of $1,000,000.
The plaintiffs rely on "barratry" in June 1979 as the casualty which overtook the vessels and contend that this is a covered event under the marine policy. Alternatively, plaintiffs contend that the proximate cause of their loss was the Sandinista insurrection and rebellion which plaintiffs contend is a covered event under the war risk policy. All four of the ships were taken by members of their crews and diverted to countries friendly with the Sandinistas (the Nicaraguan revolutionary group) in June 1979, before the incorporation and purported transfer of title to the Cayman Islands corporations named herein as plaintiffs.
The evidence convincingly establishes that the proximate cause of loss under the marine policy was the ongoing civil war in Nicaragua, a peril excepted by that insurance. Furthermore, the evidence showed that the property of Somoza and his family, including these vessels, was confiscated by Nicaragua in July 1979, a peril excepted by the war risk insurance. It was those events, not barratry on the part of the crews of the ships, that were the proximate causes of the casualties involved and consequently the plaintiffs herein are not entitled *344 to any recovery from any of the defendants for the reasons more fully stated hereafter.

SUMMARY STATEMENT
It will aid understanding of the somewhat complicated facts to set forth initially a summary statement of the facts which will then be followed by the facts in more detail.
Civil war raged in Nicaragua during 1978 through about July 20, 1979, aimed at deposing the Somoza regime. General Somoza, the dictator of Nicaragua during that period, was the owner of four vessels registered under the Nicaraguan flag which were seized by revolutionaries among the members of the crews during June 1979 and then later turned over to and confiscated by the revolutionary government which came into power in Nicaragua on or about July 20, 1979.
The vessels were taken over by the Sandinista crew members thereof on direct orders from Sandinista authorities as agents of the insurrection and rebellion in Nicaragua against Somoza and the Somoza government. The vessels were then detained and held by Cuba and Panama by way of aiding and abetting the Sandinista crew members and their Sandinista principals in Nicaragua in furtherance of the goals and in support of the interests of the Sandinistas and were ultimately returned and delivered by such crew members to Nicaragua.
In this lawsuit, the Somoza interests are claiming the insurance under Marine and War Risk policies that were issued covering these vessels.
In June and July 1979 it became increasingly apparent to Somoza that the efforts to drive him from office might succeed. Therefore, although the four vessels were already in hostile hands and beyond Somoza's control, and just before he officially abdicated on July 17, 1979 (but after he had announced that he was quitting), he caused the creation of four Cayman Islands corporations and instructed that the title of the vessels be transferred to them and that the vessels be registered under the flag of the Cayman Islands, a British entity. Through a charade of paper transactions attempting to create the semblance of a "sale" of the vessels to the Cayman Islands corporations, there was a purported transfer of the nominal title and registration of the vessels from the Panamanian and Nicaraguan corporate titles and registrations to the Cayman Islands corporate titles and registrations. No money or other consideration passed and the purpose clearly was to impede and frustrate the inevitable confiscation of the vessels by the revolutionaries. The transfer was a paper sham to hide the continuing Somoza ownership from the revolutionaries and the new government of Nicaragua which contended that Somoza had plundered the government treasury and that Somoza's assets were forfeit to Nicaragua.
Having seemingly assured himself that the purported transfer and other arrangements that he made of his interests were attended to, Somoza stepped down officially from office and fled from Nicaragua. The Junta, the new revolutionary government which took over, promptly passed laws forfeiting Somoza's goods to the State.[*]
The history of the last seven week period of civil war prior to Somoza's abdication was detailed in the world press. That history is referred to hereafter but only for the chronology as a backdrop to better understanding of the evidentiary data in the trial record  a chronology from sources whose accuracy so far as set forth herein cannot reasonably be questioned. See Rule 201, Federal Rules of Evidence.
*345 According to the New York Times (N. Y. Times Index, Nicaragua 1978, 1979, pp. 764-767; 932-35):
1. A so-called Sandinista National Liberation Front undertook activities during 1978 to oust General Somoza; he refused to resign.
2. There was civil strife during most of 1978 in Nicaragua seeking Somoza's resignation, continuing into 1979.
3. On June 1, 1979 a communique to Nicaraguans broadcast by Sandinistas from Costa Rica announced that "The hour for overthrow of President Somoza has arrived" and in connection therewith the Sandinistas called a nationwide (Nicaraguan) strike beginning June 4, 1979 with insurrection to follow soon after. (Je 1, 7:6)
4. On June 4, 1979 Nicaraguans began the general strike aimed at deposing Somoza called by the Sandinist National Liberation Front. Cities not under fire were paralyzed by the general strike aimed at overthrowing Somoza. (Je 4, 7:4; Je 6, 13:3)
5. On June 7, 1979 President Somoza declared a state of siege to help combat the general strike and guerilla war. (Je 7, 3:2)
6. June 14, 1979 Americans were evacuated from Managua to Panama. (Je 14, 1:5)
7. June 18, 1979 the Sandinistas name a provisional government of five leaders (a Junta). (Je 18, 1:3)
8. June 22, 1979, American Department of State Secretary Cyrus Vance, at an emergency meeting of the Organization of American States calls for replacement of the Somoza regime; Panama recognizes the provisional government named by the Sandinistas. (Je 22, 1:6)
9. June 24, 1979, the OAS calls for the immediate and definitive replacement in Nicaragua for President Somoza's regime. (Je 24, 1:6)
10. July 5, 1979, Somoza has agreed in principle to step down and to go into exile. (JL 5, 6:1)
11. July 8, 1979, Somoza is negotiating with the provisional Junta; meets Liberal Party leaders and his Cabinet and informs them for the first time of his decision to resign. (JL 8, 1:3)
[July 9, 1979: Somoza goes through the forms of transfer of the nominal titles of his four vessels to his newly-formed Cayman Islands corporations and reregistration thereof in Cayman Islands.]
12. July 10, 1979, five member Junta calls itself the Nicaraguan Government of National Reconstruction. (JL 10, 3:4)
13. July 18, 1979, Somoza resigns and flies to Miami, Florida. (JL 18, 1:1)
14. July 20, 1979, the Sandinistas take control of Nicaragua completing the defeat of National Guard and ending the seven week old war (more than 10,000 people dead). The new government expropriates the entire business empire of Somoza. (JL 20, 1:3)
15. July 24, 1979, the Revolutionary Government announces that it will extradite Somoza and his family and seek recovery of their illicit enrichment. (JL 24, 3:1)
The relevant history of the civil war during that period is also chronicled (in part) in Productos Carmic, S.A. v. Central Am. Beef and Seafood Trdg. Co., 621 F.2d 683 (5th Cir. 1980), a litigation concerning a confiscated Somoza asset.[**]
In August 1979 the four ships were returned by Panama and Cuba to the government of Nicaragua. They were subsequently sold in a judicial sale to cover expenses that accrued against them while they were anchored in the Nicaraguan harbor. Although there was due publication in the official newspaper, La Gaceta, of the judicial proceedings, no one representing *346 the Nicaraguan, Panamanian or Cayman Islands corporations or General Somoza appeared to contest the sale. No suit was ever filed on behalf of any of the Somoza interests to recover the vessels in Nicaragua, Panama or Cuba. The present suit was filed on September 28, 1979.

The facts in more detail

The Taking of the Ships in June 1979
1. The HOPE (owned by Somoza in the names of El Porvenir Shipping Company, Ltd. and then Ope Shipping Ltd. and chartered during this period to Mamenic Line (Marina Mercante Nicarguense S.A.)
Captain Theodoratos testified that the HOPE was taken by four crew members armed with machine guns and pistols on June 17, 1979. They ordered him to proceed to Cuba and threatened to start to kill the crew if he did not. The four identified themselves as Sandinistas and stated that they had received orders to proceed to Cuba. The HOPE sailed first to Puerto Nuevita in Cuba. There, Cuban authorities boarded the ship and a Cuban captain sailed it to Mariel, Cuba. The HOPE remained in Cuba until late August when it was sailed back to Nicaragua.
The insurance agent for the four ships, Moreno, telexed American Marine Underwriters that the HOPE was "taken over by Sandinista Elements of crew and put into Cuban port of Refuge ... where presently detained."
2. The EL SALVADOR (Owned by Somoza in the names of Cia de Navegacion La Libertad, S.A. and then Vador Shipping, Ltd. and chartered during this period to Mamenic Line.)
Captain Nichols testified that the ship was in Canal Zone waters on June 22, 1979. While he was ashore, the ship was removed to Panamanian waters and delivered to the Panamian Maritime National Guard. He was not permitted to go aboard except to pick up his belongings. He was told by the Chief Mate that five crew members armed with knives had ordered the ship moved into Panamanian waters. These five identified themselves as representatives of the Sandinistas and hoisted the Sandinista flag.
Moreno notified the marine risk insurers that the vessel was "detained" by "Panamanian Authorities".
3. The HONDURAS (Owned by Somoza in the name of Mamenic Line, viz., Marina Mercante Nicaraguense, S.A. and then Duras Shipping Ltd.)
Fausto Amador, former general manager of Mamenic Line, testified that he was notified by Mamenic's agents in Balboa that the ship had been taken from the Canal Zone into Panamanian waters by the crew and delivered to Panamanian authorities. Moreno notified the marine risk insurers that the ship was "detained" by "Panamanian authorities".
4. The MANAGUA (Owned by Somoza in the names of Cia de Navegacion Corinto, S.A. and then Agua Shipping Ltd. and chartered during this period to Mamenic Line.)
Albert Griffith, general agent of Mamenic Line in El Salvador, testified that the MANAGUA was anchored in Acajutla, El Salvador and he was instructed by his principals to hold the ship in port until further instructions were received. Despite Griffith's instructions not to allow the ship to leave port, it managed to slip out leaving behind a portion of the crew. The crew members who were left behind did not wish to be sent back to Nicaragua. Moreno notified the marine risk insurers that the MANAGUA was "detained" in Panama.

The Transfer of the Corporate Titles and Registrations of the Ships
On June 24, 1979, General Somoza wrote to Mr. Joseph Baittiner, his long-term business associate, advising him that the EL SALVADOR and HONDURAS were in Panama. He wrote on Mamenic Line stationery in his capacity as president of the corporation. He instructed Baittiner to take such action as he deemed necessary to protect all vessels owned or chartered by Mamenic Line including transferring them to new corporations under the jurisdiction and flag of other countries, changing their name and assigning all insurance policies. *347 Somoza reconfirmed these instructions on June 28 when he wrote Baittiner advising him that the HOPE was in Cuba and that the MANAGUA might be going to Panama.
Baittiner traveled to Panama in late June or early July and saw the ships. He made no effort, however, to reclaim possession. He told an American lawyer who was in Panama arranging to have the cargo on two of the Somoza ships removed that he felt it would be too costly and time-consuming to attempt to regain possession. He said that the best thing to do was to leave them in Panama.
Having decided not to try to regain possession of the ships, Baittiner chose instead to arrange for a sham transfer of title to the four Cayman Islands shell corporations. To this end, Baittiner communicated with Truman A. Skinner, an attorney in Miami, in May or June of 1979 and asked him to draw up the appropriate papers. The papers prepared in connection with the "transfer" in Miami include minutes of a "Special Meeting of Shareholders" of the Panamanian corporations purportedly selling the HOPE, MANAGUA and EL SALVADOR. Mr. Skinner acted as the so-called "President ad-hoc." Rose Mendez, a secretary in Mr. Skinner's law firm, acted as the "Secretary ad-hoc." Skinner and Mendez were listed as the sole shareholders of the three Panamanian corporations.
Not only does Mrs. Mendez appear as a so-called "shareholder" of the Panamanian corporations, she is also referred to as "Assistant Secretary" in resolutions of the Cayman Islands corporations granting powers of attorney to Baittiner to "purchase" the vessels for the Cayman Islands corporations. Mr. Skinner testified that Baittiner appointed Mrs. Mendez as "Assistant Secretary" of those corporations. The ubiquitous Mrs. Mendez also functioned as a notary public. Powers of attorney to "sell" the vessels were given to Julio Somoza, a son of General Somoza.
With respect to the HONDURAS, owned by Mamenic Line, the "document of sale" is a notarial document prepared by Renaldy Gutierrez, a notary public and occasional attorney for Mamenic Line who succeeded Mr. Baittiner as president of the four Cayman Islands corporations after Mr. Baittiner's assassination. Mr. Baittiner was the nominal "purchaser" of the HONDURAS.
Mr. Skinner's law firm billed General Somoza for the services performed in conjunction with the preparation of the papers and transactions done in Miami.
The papers for these transfers were completed in Miami on July 9, 1979 and immediately taken to Managua by Gutierrez. On July 13, 1979 the vessels were registered under the British flag in the Cayman Islands. There is no claim of any payment of any consideration for the transfers and no witness saw any money pass.
On July 14, 1979 Mr. Baittiner reported his doings to General Somoza, advising him of the transfer of the vessels to corporations under Cayman Islands flag.
Somoza's attempt to mask his actual and continued beneficial ownership of the four vessels by that series of paper transactions did not serve to put the ships beyond the reach of Nicaragua from which he was preparing to and did flee. He had already announced prior thereto that he would resign and thereafter instructed his agents to go through the forms of a sale and transfer of the vessels, their Nicaraguan deregistration and re-registration in Cayman Islands. No new ownership in fact was created  there was no bona fide sale  the whole of these maneuvers was just a paper sham to obstruct the inevitable confiscation of the vessels by Nicaragua  and they are not entitled to any legal effect for purposes hereof. During this entire period the vessels were under charter to Mamenic Line which was also nationalized as soon as Somoza resigned and fled.
The trial testimony was: that these four vessels belonged to Somoza; that the new government took the position that everything that belonged to Somoza previously belonged to Nicaragua under the expropriation order; that the purported transfers of the titles in July were of no effect and were not recognized by the new government; *348 and that the purported Cayman Islands title-holders have made no claims to the vessels allegedly because they would have been futile  there was no chance of success. A decree was passed by Nicaragua in August or September, 1979 which authorized anyone who was or felt injured by the actions of the government to assert their claims; however, this would have required the admission that Somoza was requesting the property and a claim by Somoza would have been futile. It was further testified that at all events the four vessels are in Nicaragua under the control of the Nicaraguan government and being held by it because they were Somoza's property. The Nicaraguan government is a government recognized by the United States.
Finally, in the last minute scurrying by Somoza's numerous agents to try to save Somoza's assets from confiscation by the Sandinistas, one element of the paper shuffle may have been overlooked. Mamenic Line was the bareboat charterer of the EL SALVADOR, the HOPE and the MANAGUA as well as the owner of the HONDURAS. In the rush to prepare all the documents necessary for the purported sale of the four ships, the documents necessary for termination of the Nicaraguan bareboat charters may never have been prepared. Amidst the abundance of documents introduced into evidence by plaintiffs, the cancellations of the charters are conspicuously absent. Fausto Amador, the manager of Mamenic Line, and a long-time and devoted employee of Somoza's testified that he signed cancellation documents, but it is notable and suspicious and tends to cast doubt on his testimony, that these are the only documents which were not carefully shuttled back from Managua to Miami by Mr. Gutierrez just before the fall of the Somoza regime. Thus, there is some likelihood that the transfer of title, itself a sham, was ineffective even by its own devices. If Mamenic Line remained the bare boat charterer after the transfer of title, Mamenic Line had legal rights to the possession of the four ships even after the transfer of title. When Mamenic Line was nationalized by the Sandinista Government its right to possession transferred to the new government which then confiscated the ships as an Act of State.

The Insurance Coverage
The marine (hull) risk insurance covers the perils of "barratry of the Master and Mariners" ... "excepting, however, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by the endorsement thereon". Under the head of WAR, STRIKES AND RELATED EXCLUSIONS the policy reads "This policy does not cover any loss, damage or expense caused by, resulting from or incurred as a consequence of:
(e) civil war, revolution, rebellion, insurrection or civil strife arising therefrom...
The War Risks Clauses include insurance coverage to cover "only those risks which would be covered by the attached Policy (including collision liability) in the absence of the War, Strikes, and Related Exclusions Clause. However, under EXCLUSIONS it is provided that
This insurance does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:
(f) capture, seizure, arrest, restraint, detainment, or confiscation by the Government of the United States or of the country in which the Vessel is owned or registered.

Liability of the Marine Risk Insurers
The Marine policy covers barratry. The classic definition of barratry was given by Lord Ellenborough in Earle v. Rowcroft, 8 E. 126, 138 (1806), as follows:
... a fraudulent breach of duty by the Master, in respect to his owners; or, in other words, a breach of duty in respect to his owners with a criminal intent, or ex maleficio, is barratry.
In the Republic of China v. National Union Fire Insurance Co. of Pittsburgh, 151 F.Supp. 211 (D.Md.1957), aff'd in part and rev'd in part, 254 F.2d 177 (4th Cir. 1958), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958) Chief Judge Thomsen stated at p. 227:

*349 If the Captain deviates, or is compelled by the crew to deviate the vessel from its proper course and to put into an unauthorized port in fraud of his or their duty to owners, it is barratry.
Thus, if the loss herein was caused by barratry, plaintiffs are entitled to prevail. The marine underwriters contend that the loss was caused by civil war which is not covered by their policy, but is an excluded risk. There is little doubt that barratry, as it is classically defined, occurred and contributed to the loss of the ships. The barratry would not have occurred, however, but for the civil war. The real underlying cause of the loss of the ships was the civil war in Nicaragua. Loss resulting from civil war is not covered by the marine policy.
In Republic of China, supra, it was held that the loss, though brought about by barratry, was a consequence of civil war and hence was not covered by the marine risk policy. The Court held that the F.C.&S. Clause "excludes from the coverage of the marine risk policy any barratry which is a consequence of civil war", ... 151 F.Supp. 211, 235.
The loss of the four Somoza ships was "incurred as a consequence of civil war."
[I]n accord with the reasonable understandings and expectations of the parties, we must attempt to ascertain what the Supreme Court has referred to as the "predominant and determining" or the "real efficient" cause of the loss. See, e. g. Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 58, 71 S.Ct. 135 [137], 95 L.Ed. 68 (1950); Lanasa Fruit Steamship, supra, 302 U.S. [556] at 565, 58 S.Ct. [371] at 375 [82 L.Ed. 422]. Determination of the proximate cause in these cases is thus a matter of applying common sense and reasonable judgment as to the source of the loss alleged. Blaine Richards & Co. v. Marine Indemnity Insurance Co., 635 F.2d 1051, 1054 (2d Cir. 1980).
In Pan American World Airways, Inc. v. Aetna Casualty and Surety, 505 F.2d 989, 1017 (2d Cir. 1974) the term "civil war" was explained as follows
"Insurrection" presents the key issue because "rebellion", "revolution," and "civil war" are progressive stages in the development of civil unrest, the most rudimentary form of which is "insurrection."
An insurrection is "a movement accompanied by actions specifically intended to overthrow the constituted government and to take possession of the inherent powers thereof ... if the insurrection or rebellion proceeds to the attainment of its objective, viz., the overthrow of the old constituted government and the establishment of a new one in its place, then the movement, retroactively will be dignified by the characterization of a `revolution'" Home Insurance Co. of New York v. Davila, 212 F.2d 731, 736 (2d Cir. 1954).

Liability of the War Risk Insurers
The war risk insurers deny coverage under their policy claiming that the loss is excluded because it is a "capture, seizure, arrest, restraint, detainment or confiscation by ... the country in which the vessel is owned or registered". (Emphasis added). The losses of the ships were the result of a confiscation by the Nicaraguan government of Nicaraguan property and, therefore, excluded from coverage by the war risk policy.
Somoza's attempt to transfer the corporate titles and registrations of the four ships in order to avoid the effect of this clause was ineffective and a sham. The ships had already been taken from Somoza's possession by the Sandinistas when this attempt was made. As the Privy Council noted in Civil Transport Incorporated v. Central Air Transport Corporation (1953) A.C. 70, 2 Lloyd's Reg. 209 (Privy Council)
Subsequent recognition de jure of a new government [the Sandinista Government] as the result of successful insurrection can in certain cases annul a sale of goods by a previous government [Somoza]. If the previous government [Somoza] sells goods which belong to it but are situated in territory effectively occupied at the time by insurgent forces acting on behalf of what is already a de facto new government, *350 the sale may be valid if the insurgents are afterwards defeated and possession of the goods is regained by the old government. But if the old government [Somoza] never regains the goods and the de facto new government becomes recognized ... as the de jure government, purchasers from the old government [Somoza] will not be held in her Majesty's courts to have a good title after that recognition. Id. at 93.
The agents of the de facto Sandinista Government took control of the ships in June, 1979 and delivered them for safekeeping to two nations, Panama and Cuba which recognized the Sandinista Junta as the legitimate government of Nicaragua. Somoza purported to transfer the title to the ships after they were seized by the Sandinistas. Somoza never regained the goods and the Sandinistas replaced him in power and replaced Somoza as the recognized de jure government. The purported transferees of the titles to the ships did not acquire good title, one that would be recognized in Court as against the new Nicaraguan Government. The nominal titles in which the ships were registered were at all times representative of Somoza's ownership in fact, an ownership that was and remained subject to Nicaragua. The paper charade engaged in by Somoza can be seen as nothing more than an attempt to evade factors involved in the exclusions of the war risk policy. It is unlikely that the plaintiffs expected to enhance their chances of reclaiming the ships by their maneuvers. Their subsequent inaction  failure to assert any claim to the ships  supports this view. Mr. Baittiner's statement that it would be too time-consuming and expensive to sue for recovery of the ships in Panama is damning.
The complaints in these actions are dismissed and judgment in each case is to be entered in favor of the defendants.
The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Federal Rules of Civil Procedure.
So Ordered.
NOTES
[*] Decree No. 3 of the government Junta of National Reconstruction of the Republic of Nicaragua on July 20, 1979 confiscates the property of the Somozas. It reads:

Article 1. The Attorney General is authorized to immediately proceed with the taking over, requisitioning and confiscation of all the assets of the Somoza family, military personnel and officials who have abandoned the country since December 1977;
Once said property has been taken over, requisitioned or confiscated, the Attorney General shall turn over everything that he has done to the competent authorities.
[**] "Insurrection, armed conflict, battles in the street, terrorist attacks, riots, war, revolution, and the overthrow of a dictator permeate this appeal. General Anastasio Somoza was forced to resign as President of Nicaragua on July 17, 1979. The new government promptly nationalized a great portion of the vast holdings of Somoza and his family, including a small Nicaraguan meat processing company  already close to bankruptcy  Productos Carnic, S.A." Id. at 685.