687 F.2d 639
 OPE SHIPPING, LTD. and El Porvenir Shipping Company, Inc.,
Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE COMPANY, INC., United States Fidelity &
Guaranty Companies, Inc., Various British
Underwriters and Underwriters at Lloyds,
Defendants-Appellees.
VADOR SHIPPING, LTD., and Cia. de Navegacion La Libertad,
S.A., Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE COMPANY, INC., United States Fidelity &
Guaranty Companies, Inc., Various British
Underwriters and Underwriters at Lloyds,
Defendants-Appellees.
AGUA SHIPPING, LTD., and Cia. De Navegacion Corinto, S.A.,
Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE COMPANY, INC., United States Fidelity &
Guaranty Companies, Inc., Various British
Underwriters and Underwriters at Lloyds,
Defendants-Appellees.
DURAS SHIPPING, LTD., and Nicaraguense, S.A., Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE COMPANY, INC., United States Fidelity &
Guaranty Companies, Inc., Various British
Underwriters and Underwriters at Lloyds,
Defendants-Appellees.
 No. 693, Docket 81-7701.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 22, 1982.
Decided Aug. 30, 1982.
 
 Joseph F. De May, Jr., New York City (Victor S. Cichanowicz, Alfred F. Koller, Jr., and Cichanowicz & Callan, New York City, on the brief), for plaintiffs-appellants.
 Michael J. Ryan, New York City (Frank H. Loomis and Hill, Betts & Nash, New York City, on the brief), for defendants-appellees Marine Risk Underwriters.
 Brendan J. Connolly, New York City (Mendes & Mount, New York City, on the brief), for defendants-appellees War Risk Underwriters.
 Before WATERMAN, VAN GRAAFEILAND and MESKILL, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 Plaintiffs appeal from orders and a judgment of the United States District Court for the Southern District of New York, 521 F.Supp. 342, Pollack, J., denying them recovery of the insured value of four ships. We affirm in part and reverse in part.
 
 
 1
 In June, 1979, the El Salvador, the Hope, the Managua and the Honduras were owned respectively by three Panamanian corporations and one Nicaraguan corporation, all apparently under the control of General Anastasio Somoza. The ships were registered under the Nicaraguan flag. The four vessels were lost to their owners during the 1979 Nicaraguan revolution which resulted in the overthrow of the Somoza government by Sandinista forces. The chronology of events leading to the demise of the Somoza regime is set forth in the opinion of the court below, reported in 521 F.Supp. at 342.
 
 
 2
 On June 17, 1979, the Hope was taken over by four armed crew members who identified themselves as Sandinistas and ordered the ship's captain to proceed to Cuba. In Puerto Nuevita, Cuba, Cuban authorities came aboard the Hope and sailed it to Mariel, Cuba, where it remained until it was returned to Nicaragua.
 
 
 3
 On June 22, the El Salvador was removed from the Canal Zone to Panamanian waters while its captain was ashore. The chief mate stated that five armed crew members, who identified themselves as Sandinistas, ordered the transfer and hoisted the Sandinista flag. The Panamanian Maritime National Guard took control of the ship. The Honduras and the Managua suffered similar fates around June 22. The Honduras was taken from the Canal Zone into Panamanian waters, while the Managua slipped out of El Salvador in contravention of orders and also was taken to Panama.
 
 
 4
 On June 24 and 28, 1979, Somoza informed his longtime business associate Joseph Baittiner about the fate of the ships. At Somoza's request, Baittiner then undertook to transfer title of the ships to Cayman Islands corporations. On July 9, papers were executed for the transfer of the Hope from El Porvenir Shipping Co., Inc. to OPE Shipping, Ltd., the El Salvador from Cia. de Navegacion La Libertad, S.A., to Vador Shipping, Ltd., the Honduras from Marina Mercante Nicaraguense, S.A. to Duras Shipping, Ltd. and the Managua from Cia. de Navegacion Corinto, S.A. to Agua Shipping, Ltd.
 
 
 5
 On or before July 10, the marine risk coverage on the ships was cancelled, either for non-payment of premiums or because of the change in ownership. On July 11, the war risk insurers authorized the assignment of their policy to the Cayman Islands corporations. On July 13, the vessels were registered under the British flag in the Cayman Islands.
 
 
 6
 The ships remained in Cuba and Panama until after the Sandinistas gained complete control of the Nicaraguan government. The vessels were returned to Nicaragua in August, 1979, and on September 28, 1979, plaintiffs sued in the court below to recover their insured value.
 
 
 7
 In the summer of 1980, the Empresa Nacional de Puertos, an agency of the Sandinista government, commenced actions in the First District Court of Managua, Nicaragua, to recover port charges for the four ships which had accrued while they were laid up in Corinto, Nicaragua. The ships were attached pursuant to judicial orders, and, following the entry of judgments, were offered for sale at public auction and purchased by Empresa for the amount of the charges owed.
 
 
 8
 Plaintiffs claimed that their losses were covered by both the marine risk and war risk policies. The district court held that they were covered by neither. For the reasons discussed below, we affirm as to the marine risk but reverse as to the war risk.
 
 THE MARINE RISK POLICIES
 
 9
 At the time the ships were diverted from their courses, the marine risk insurance was in effect. The marine policy covered loss due to barratry of the master and mariners and other like perils, but specifically excluded loss resulting from civil war, revolution, rebellion, insurrection or civil strife arising therefrom, hostilities or warlike operations, whether or not there was a declaration of war.
 
 
 10
 Barratry has been defined as "an act committed by the master or mariners of a ship, for some unlawful or fraudulent purpose, contrary to their duty to their owners, whereby the latter sustain an injury." Marcardier v. Chesapeake Insurance Co., 12 U.S. (8 Cranch) 39, 49, 3 L.Ed. 48 (1814). It consists of serious misconduct or dishonest breach of trust resulting in prejudice to the owner, Gilmore and Black, The Law of Admiralty 73 (2d ed. 1975); Couch on Insurance 2d § 43:38 (1963), and may take place even though the disobedient crew or master did not act with an intent to derive personal benefit from the wrongful act, id. § 43:39.
 
 
 11
 There can be little question that the four crews were guilty of barratrous conduct. Uncontradicted testimony established that they forced the masters to relinquish control of their ships and then sailed the vessels to the waters of nations hostile to Somoza and friendly to the Sandinista cause. These actions were in clear derogation of the crews' duties to the shipowners.
 
 
 12
 However, because of the policy exclusions, the barratrous acts cannot be viewed in isolation without consideration being given to causative and motivative factors. When ascertaining the legal cause of loss for insurance purposes, a court must look to the "real efficient cause" of the occurrence rather then the single cause nearest in time to the loss. Blaine Richards & Co. v. Marine Indemnity Insurance Co., 635 F.2d 1051, 1054 (2d Cir. 1980) (quoting Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co., 302 U.S. 556, 565, 58 S.Ct. 371, 375, 82 L.Ed. 422 (1938)). Determination of proximate cause is a matter of "applying common sense and reasonable judgment as to the source of the loss alleged." Blaine Richards & Co. v. Marine Indemnity Insurance Co., supra, 635 F.2d at 1054-55.
 
 
 13
 From a common sense standpoint, it is quite obvious that the unlawful conduct of the four crews was a direct result of the Nicaraguan civil war. The barratrous mariners took control of the ships in the name of the Sandinistas, professed to the acting under orders from the Sandinista regime and, in at least one case, hoisted the Sandinista flag over the ship. The commandeered vessels were taken into the waters of nations known to be friendly to the revolutionary cause and were returned to Nicaragua only after Somoza was ousted and the Sandinistas were in control. Moreover, it is evident, from the concerted nature of the activities, that the seamen acted under orders from a central authority. The district court did not err, therefore, in holding that the conduct of the crews fell squarely within the exclusions of the marine policy so as to relieve the marine underwriters from liability.
 
 THE WAR RISK POLICY
 
 14
 The war risk policy complemented the marine risk policy by providing coverage for the risks excluded from coverage in the latter policy under the "War, Strike and Related Exclusions" clause. At first blush, therefore, it would seem that the very facts which relieved the marine underwriters from liability imposed liability upon the war risk underwriters. However, the war risk underwriters argued successfully below that they, too, were relieved of liability, because their own policy excluded coverage for losses due to "(c) apture, seizure, arrest, restraint, detainment, or confiscation by the Government ... of the country in which the Vessel is owned or registered." We believe the district court should have rejected this argument.
 
 
 15
 Prior to July 9, 1979, title to the El Salvador, the Hope, and the Managua was, in each case, in a Panamanian corporation. Although the stock of these corporations may have been substantially or wholly owned by Somoza, under "generally applicable principles", Fisser v. International Bank, 282 F.2d 231, 238 (2d Cir. 1960) that fact, standing alone, did not warrant the court in piercing the corporate veils so as to place ownership of the vessels in Somoza and thus in the Country of Nicaragua. Lehigh Valley Industries, Inc. v. Birenbaum, 527 F.2d 87, 94 (2d Cir. 1975); Zubik v. Zubik, 384 F.2d 267, 272-74 (3rd Cir. 1967). The defendants insured the corporations as owners and were paid for so doing. In the absence of a finding that such fraud or misrepresentation was perpetrated on the defendants as would make it inequitable to hold them to the terms of their contracts, the district court should not have disregarded the corporate existence and titles. Lehigh Valley Industries, Inc. v. Birenbaum, supra, 527 F.2d at 94-95; Brunswick Corp. v. Waxman, 599 F.2d 34, 36 (2d Cir. 1979); Hellenic Lines Ltd. v. Winkler, 249 F.Supp. 771, 777-78 (S.D.N.Y.1966). The district court erred, therefore, in holding that Nicaragua was the country of ownership of the El Salvador, the Hope, and the Managua, within the meaning of the war risk policy.
 
 
 16
 Exhibit No. 17, received in evidence during the trial, shows that the Nicaraguan registry of all four ships was cancelled by Nicaraguan authorities on July 9, 1979. Any confiscation or detainment by the government of Nicaragua which occurred after that date would not be excluded from coverage on the ground that Nicaragua was the country of registry.
 
 
 17
 Although, prior to July 9, title to the Honduras was in a Nicaraguan corporation, title to all four ships was transferred on that day to Cayman Islands corporations. In support of its holding that the four ships were owned in Nicaragua, the district court found that the transfer of title was "just a paper sham to obstruct the inevitable confiscation of the vessels by Nicaragua." 521 F.Supp. at 347. In reaching this conclusion, the district court seemed to be influenced in large measure by the lack of proof that any money changed hands, i.e., by the absence of consideration for the contract. It is on that basis that the war risk insurers seek to justify the district court's finding. However, we find no merit in their argument.
 
 
 18
 Lack of consideration is available as a defense between parties to an executory contract. It is not grounds for avoiding a contract that has been fully performed. 17 Am.Jur.2d Contracts § 86. Where, as here, the parties to a conveyance are satisfied with their bargain, a third person who is not a defrauded creditor of the grantor may not challenge the contract's validity on the basis of alleged insufficient consideration. 37 C.J.S. Fraudulent Conveyances § 276. The district court's statement that the Cayman Islands corporations did not acquire good title to the ships, "one that would be recognized in Court as against the new Nicaraguan Government", 521 F.Supp. at 350, is interesting but irrelevant conjecture. The Nicaraguan Government is not a party to this action. See Pelton v. Westchester Fire Insurance Co., 77 N.Y. 605 (1879).
 
 
 19
 Assuming for the argument that private ownership of the four ships remained at all time within the Country of Nicaragua, the district court nonetheless erred in holding that "(t)he losses of the ships were the result of a confiscation by the Nicaraguan government ... and, therefore, excluded from coverage by the war risk policy", 521 F.Supp. at 349. When the ships were seized by their crews, the Sandinista rebels were not the "Government" of Nicaragua. After the Sandinistas became the legitimate government, all actions previously taken by it as a rebel government were validated retroactively. Oetjen v. Central Leather Co., 246 U.S. 297, 302-03, 38 S.Ct. 309, 310-11, 62 L.Ed. 726 (1918). Accordingly, if the Sandinistas had chosen to treat the taking of the four vessels by their crews as a seizure or confiscation by the Sandinista government, it might be argued that, under the principle of retroactive validation, the loss was excluded from war risk coverage. The record is devoid, however, of any proof that the Sandinista government chose to ratify the confiscation of the ships, so that nunc pro tunc the confiscation became governmental action within the meaning of the insurance policy.
 
 
 20
 The Sandinista government commenced actions in 1980 against the Cayman Islands corporations as owners of the four vessels to recover port charges accrued by the ships after they were returned to Nicaragua. Defendants' expert witness, Dr. Ortega, testified that, at the conclusion of those proceedings, the Nicaraguan government "became" the owner of the ships. The bringing of those actions and the sales of the ships to the Sandinista government belie the insurers' assertions that the Nicaraguan government had confiscated the ships in 1979.
 
 
 21
 Although the Sandinista government had issued a decree on July 20, 1979, authorizing the Attorney General to confiscate "all the assets of the Somoza family, military personnel and officials who have abandoned the country since December, 1977", the record does not indicate that the Attorney General ever issued a confiscation order pursuant to this authority. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401-03, 84 S.Ct. 923, 926-27, 11 L.Ed.2d 804 (1964). Had he done so, the Sandinista government would hardly have named the Cayman Islands corporations as owners and proceeded against them to recover port charges. Because the loss of the ships did not result from "(c)apture, seizure, arrest, detainment or confiscation" by the Nicaraguan government, the loss was not excluded under the terms of the war risk policies.
 
 
 22
 The war risk policy contained the usual "sue and labour" clause. Pursuant to this clause, plaintiffs were obligated to exercise the care of prudent insured owners to protect their property, in order to prevent or minimize loss to the carriers. Fishing Fleet, Inc. v. Trident Insurance Co., 598 F.2d 925, 929 (5th Cir. 1979). The duty is one of reasonable care under all the circumstances and in the light of pertinent commercial and maritime practices. Couch on Insurance 2d § 43:136. It does not require the insured to use all possible care or to follow the wisest course. Id. Although the district court did not find a violation of this clause as a basis for its holding, the war risk insurers urge this Court to find such a violation as a basis for affirming. We decline to do so.
 
 
 23
 The proof shows that both General Somoza and his associate, Joseph Baittiner, were assassinated and that the captain of the Hope was stabbed and almost fatally injured in Cuba. Association with the deposed Nicaraguan regime apparently was not conducive of longevity. It is undisputed in this case that both Cuba and Panama were opposed to the Somoza government and were actively abetting the Sandinista cause. Their activities in connection with the ship seizures indicated quite clearly that they were not about to hand the ships back to their owners. Mr. Renaldy Gutierrez, a Nicaraguan lawyer, testified that the ships could not have been recovered from Panama or Cuba because of the ships' connection with Somoza. Plaintiffs' agent did petition the Panamanian Ministry of Foreign Affairs for recovery of the three ships detained there, but without success.
 
 
 24
 The insureds' failure to participate in the in rem proceedings for port charges is readily understandable. Assuming that the insureds' representatives could have entered Nicaragua safely, there is no proof that they had timely notice of the proceedings, which was given by publication in a Nicaraguan newspaper of limited circulation. Moreover, the port charges levied against the ships were in excess of the value which the Nicaraguan court placed on the ships. Under these circumstances, plaintiffs' sue and labour activities, although limited, were all that a prudent person would have been expected to undertake.
 
 DISPOSITION
 
 25
 The marine risk insurers are not liable for the loss of the ships, which was due to the civil war in Nicaragua. The judgment as to them is affirmed. The loss was covered by the war risk policies. The judgment in favor of the war risk insurers is reversed, and that portion of the case is remanded to the district court with instructions to enter judgment for plaintiffs, OPE Shipping, Ltd., Vador Shipping, Ltd., Agua Shipping, Ltd. and Duras Shipping, Ltd., against the war risk insurers pursuant to the terms of the war risk policy and the stipulations of the parties.