OPE SHIPPING, LTD. and El Porvenir Shipping Co., Inc., Plaintiffs,

v.

UNDERWRITERS AT LLOYDS, Defendants.

VADOR SHIPPING, LTD. and Cia. De Navegacion La Libertad, S.A., Plaintiffs,

v.

UNDERWRITERS AT LLOYDS, Defendants.

AGUA SHIPPING, LTD. and Cia. De Navegacion Corinto, S.A., Plaintiffs,

v.

UNDERWRITERS AT LLOYDS, Defendants.

DURAS SHIPPING, LTD. and Marina Mercante Nicaraguense, S.A., Plaintiffs,

v.

UNDERWRITERS AT LLOYDS, Defendants.

Nos. 79 Civ. 5225 (MP) to 79 Civ. 5228 (MP).

United States District Court, S.D. New York.

Dec. 22, 1983.

Cichanowicz & Callan by Victor S. Cichanowicz, Joseph F. De May, Jr., Alfred F. Koller, Jr., New York City, for plaintiffs.

Mendes & Mount by Brendan J. Connolly, George L. Maniatis, New York City, for defendants.

## MEMORANDUM AND ORDER

MILTON POLLACK, Senior District Judge.

By these actions, plaintiffs sought recovery of the insured value of four ships from defendants "marine risk insurers" and "war risk insurers." This Court entered judgment in favor of all defendants. The Court of Appeals for the Second Circuit affirmed with respect to the "marine risk insurers," reversed with respect to the "war risk insurers," and directed this Court to enter judgment in favor of the plaintiffs against the "war risk insurers." Those defendants then brought this motion for a new trial under Fed.R.Civ.P. 59(a). For reasons to be set forth below, that motion shall be granted.

These actions concern four vessels of Nicaraguan registry—the *El Salvador,* the *Hope,* the *Managua* and the *Honduras* —seized by Sandinista (revolutionary) elements during the 1979 Nicaraguan revolution. The *El Salvador,* the *Hope* and the *Managua* were owned by Panamanian corporations prior to seizure; a Nicaraguan corporation owned the *Honduras* prior to its capture. The stock in each of these corporations was substantially or wholly owned by General Anastasio Somoza, then President of Nicaragua. Based on the evidence available to it, the Second Circuit concluded that the entity status of the corporations which owned the vessels could not be disregarded:

Although the stock of these corporations may have been substantially or wholly owned by Somoza, under "generally applicable principles", [citation] that fact, *standing alone,* did not warrant the court in piercing the corporate veils so as to place ownership of the vessels in Somoza and thus in the Country of Nicaragua. *Ope Shipping, Ltd. v. Allstate Insurance Co., Inc.,* 687 F.2d 639, 642 (2d Cir.1982) (emphasis added). Thus, the *El Salvador,* the *Hope,* and the *Managua* were held to be owned in Panama, while the *Honduras* was held to be owned in Nicaragua. At the time they were seized, however, all four vessels were chartered by a Nicaraguan corporation, Marina Mercante Nicaraguense S.A. (Mamenic), of which General Somoza was president.

On June 17, 1979, the *Hope* was taken over by four armed crew members. The crewmen identified themselves as Sandinistas, and ordered the ship's captain to sail the vessel to Cuba. Cuban authorities boarded the ship in Puerto Nuevita, Cuba and sailed it to Mariel, Cuba where it remained until returned to Nicaragua after the ultimate victory of the Sandinistas.

On or about June 22, 1979, the *El Salvador* and the *Honduras* were removed from Canal Zone to Panamanian waters by crew members of those vessels. Those vessels were "detained" by Panamanian authorities, but were returned to Nicaragua after the success of the Sandinista revolution.

In late June, 1979, the *Managua* was anchored in Acajutla, El Salvador; the Mamenic agent in El Salvador had instructions to hold the ship in port pending further instructions. The ship slipped out of port one night, leaving behind a portion of the crew. Those crewmen refused return to Nicaragua. The ship arrived in Panama, where it was "detained" by the authorities until the end of the Nicaraguan revolution.

Each of the four Cayman Islands corporations asserting claims herein is a transferee of title to one of these four vessels. On July 9, 1979, title to the *Hope* was transferred to Ope Shipping, Ltd., ownership of the *El Salvador* was transferred to Vador Ship-

ping, Ltd., Duras Shipping, Ltd. received title to the *Honduras* and title to the *Managua* was transferred to Agua Shipping, Ltd. On July 13, 1979, the vessels were registered by plaintiffs in the Cayman Islands, under the British flag.

Defendants "war risk insurers" provided insurance coverage to the Central American corporations which owned the four vessels prior to July 9, 1979. On July 11, 1979, these defendants authorized the assignment of their policy to the Cayman Islands corporate transferees of the Central American corporations. At all times pertinent hereto, the scope of that coverage included losses arising from "civil war, revolution, rebellion, insurrection or civil strife arising therefrom." *Ope Shipping, Ltd. v. Allstate Insurance Co., Inc.,* 521 F.Supp. 342, 348 (S.D.N.Y.1981), *aff'd in part, reversed in part,* 687 F.2d 639 (2d Cir.1982). The war risk policy, however, excluded

> any loss, damage, or expense caused by, resulting from, or incurred as a consequence of:
>> (f) capture, seizure, arrest, restraint, detainment, or confiscation by the Government of the United States or of the country in which the vessel is owned or registered.

*Ope Shipping, Ltd. v. Allstate Insurance Co., Inc.,* 521 F.Supp. at 348. Defendants, moreover, allege in this motion, but did not establish at trial, that the war risk policy automatically terminated with respect to the vessel insured "if and when the vessel is requisitioned, either for title or use."

After trial, this Court entered judgment in favor of the war risk defendants, holding that the losses of the ships were the result of a confiscation by the Sandinista (de facto) government of Nicaragua, and, as such, excluded from coverage by the war risk policy. *See Ope Shipping Ltd. v. Allstate Insurance Co., Inc.,* 521 F.Supp. at 349. The Second Circuit reversed this portion of this Court's decision for two reasons. First, as noted above, the Second Circuit held that the "corporate veils" surrounding the ownership of the vessels could not be pierced and that the vessels therefore were owned

in the nations in which their owners were incorporated. This holding, however, really did not serve to establish the inapplicability of the exclusionary language of the war risk policy. That policy specifically excluded coverage of capture, seizure, arrest, etc. by the government of the nation in which the vessels were owned *or registered.* This Court specifically found that all four vessels were *registered* in Nicaragua. Moreover, one of the vessels—the *Honduras*—was owned by a Nicaraguan corporation, and was thus "Nicaraguan owned" by the standards of the Second Circuit.

The second basis of the Second Circuit's reversal was more telling. The Second Circuit held that the Sandinista Junta was not the government of Nicaragua at the time the vessels were seized by Sandinista elements. The vessels thus could not be said to have been seized by the Nicaraguan government of the day. The Sandinista Junta (the government of Nicaragua as of July 20, 1979, at the very latest), moreover, never acted to seize the ships (despite a decree authorizing the Attorney General to confiscate all the property of the Somoza family) or to ratify the earlier seizure of the ships by Sandinista elements. As such, the ships were never seized by the Nicaraguan government, and the exclusionary clause of the war risk policy was thus inapplicable, even if the nation in which the vessels were owned or registered was Nicaragua.

## DEFENDANTS' MOTION FOR A NEW TRIAL

Defendants have moved for a new trial pursuant to Fed.R.Civ.P. 59(a). That rule provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues .... (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States.

A motion for a new trial may be based on the discovery of evidence; such a motion is addressed to the discretion of the court. *See Kargman v. Sullivan,* 582 F.2d

432

131 (1st Cir.1978). Federal case law, however, establishes a number of prerequisites to the court's exercise of that discretion.

> Before a new trial may be granted on the basis of newly discovered evidence, there must be a showing that the alleged newly discovered evidence was discovered since the trial; facts from which the court may infer reasonable diligence on the part of the moving party; that the evidence is not merely cumulative or impeaching; that the evidence is material; and the evidence is of such a character that on a new trial it will probably produce a different result. [Citations].

*McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 410 (10th Cir.1965).

■■■ "Newly discovered evidence" is "evidence of facts in existence at the time of trial of which the party seeking a new trial was justifiably ignorant." *Campbell v. American Foreign S.S. Corp.,* 116 F.2d 926, 928 (2d Cir.), *cert. denied,* 313 U.S. 573, 61 S.Ct. 959, 85 L.Ed. 1530 (1941). If such evidence was available or by the use of reasonable diligence could have been available at trial to the party seeking a new trial, that evidence cannot support an order for a new trial. *Mayer v. Higgins,* 208 F.2d 781, 783 (2d Cir.1953). A narrow exception to this rule has been recognized: a new trial may be ordered to prevent a grave miscarriage of justice even though the "newly discovered evidence" supporting that order would have been available to the moving party at trial had that party exercised proper diligence. *Ferrel v. Trailmobile, Inc.,* 223 F.2d 697, 698 (5th Cir.1955). *See also Samuels v. Health and Hospitals Corp.,* 591 F.2d 195, 199 (2d Cir.1979). This exception, however, has been restricted to cases in which the evidence is practically conclusive. *Niedland v. United States,* 338 F.2d 254, 260 (3d Cir.1964).

The discovery of new evidence cannot support an order for a new trial unless that evidence is material, not cumulative or impeaching, and likely to produce a result different from that reached in earlier proceedings. *McCullough Tool Co. v. Well Surveys, Inc., supra* at 410. In short, the evidence must make "a prima facie showing that a different result should have been reached initially." *Unarco Industries, Inc. v. Evans Products, Co.,* 403 F.2d 638, 639 (7th Cir.1968).

## THE DEFENDANTS' NEW EVIDENCE

Defendants have offered as evidence the testimony of George Robakis, former Captain of the *Managua,* and abstracts of the Log Book of the *Managua* prepared by Captain Robakis for his personal records. This evidence, defendants contend, will show that the *Managua* was commandeered by General Somoza and used as a gunboat to bombard Sandinista shore positions in Nicaragua before it put into Acajutla, El Salvador, where it was captured by Sandinista elements.

Specifically, defendants intend to prove that the *Managua* was anchored at Puerto Somoza, Nicaragua, *en route* to ports in El Salvador when, on the evening of May 29, 1979, the Port Captain of Puerto Somoza informed Captain Robakis that the *Managua* was being requisitioned by General Somoza. The Port Captain allegedly instructed Captain Robakis to hold the Managua in readiness for use by Somocista forces (forces loyal to the Somoza regime.) At 3:00 a.m. on May 20, 1979, the *Managua* assertedly was boarded by three Nicaraguan military officers and seventeen soldiers and equipped with three 40 mm. artillery pieces. Under the orders of a Lieutenant Colonel Mohrke, the vessel proceeded to Bahia de Salinas, Nicaragua, where it bombarded Sandinista shore positions for three hours. The *Managua* allegedly left the area in haste after receiving return fire from Sandinista forces. When the ship was released to Captain Robakis on May 31, 1979, Robakis proceeded to El Salvador where he assertedly turned the ship over to another Master and terminated his employment relationship with Mamenic.

## ANALYSIS

■■■ Before this Court can evaluate defendants' motion for a new trial based upon the asserted discovery of material evidence,

this Court must address a threshold issue. In support of their motion, defendants have submitted an affidavit of counsel for the defendants and an English language translation of the abstracts of the ships log of the *Managua* prepared by Captain Robakis for his personal records. While it is true that a Court in this district once held that "the affidavit of a party or his attorney as to what a witness will testify to is ... insufficient to support a motion for a new trial," *Petition of Weltzien,* 68 F.Supp. 1000, 1003 (S.D.N.Y.1946), more recent decisions of the federal judiciary have indicated that affidavits may be used on a motion for a new trial. *United States v. Gegax,* 506 F.2d 460, 461 (9th Cir.1974). In *Gegax,* the Court allowed that under some circumstances the affidavit of counsel having no firsthand knowledge of the matter asserted may suffice to support a motion for a new trial. *Id.* at 461. While counsel's affidavit was held insufficient to support a new trial motion in *Kleinschmidt v. United States,* 146 F.Supp. 253, 257 (D.Mass.1956), that affidavit explained the moving party's failure to produce at trial evidence in the possession of the moving party at all times during the trial. That affidavit, moreover, was submitted with an affidavit of moving party which did not address that issue. To the contrary, in the present case, the attorney's affidavit does not seek to explain away information possessed at the time of trial. Here, evidence was not in the possession of the client at trial, and its existence is recited by the moving attorney in the form of an attachment to his affidavit of the abstract of the revealing log of the ship establishing that the *Managua* was commandeered for use as a gunboat by General Somoza in advance of the seizure of the vessel by its sailors, which seizure was the subject and issue of this litigation heretofore in this Court and on appeal. Thus, the corroborative source of the information from Captain Robakis is before this Court on this motion for a new trial. More is not required at this time. The rest will come out in the proffered testimony of Captain Robakis.

As the new evidence of which the defendants have made an offer of proof was clearly in existence at the time of trial, this Court must begin its consideration of the merits of this motion by determining whether the defendants were justifiably ignorant of the existence of that evidence. The trial transcript yields some indication that defendants were at least aware of the possibility that the *Managua* had been used as a Somocista gunboat. The following exchange took place during the counsel for the defendants' cross-examination of Albert Griffith, the former El Salvador agent of Mamenic:

Q Was there a rumor prevalent in El Salvador at the time that the *Managua* had been used or was going to be used as a gunboat?

A Not that I remember, sir.

Q You don't remember telling me that on the phone?

A You asked me? You were the one who spoke to me.

Q No, you were the one who told me.

*Transcript,* p. 210–211.

■ Despite defendant's knowledge of the rumored use of the *Managua* to bombard Sandinista shore positions, this Court concludes that defendants could not have discovered prior to trial the evidence to be offered by Captain Robakis. Defendants claim, and plaintiffs do not deny, that plaintiffs produced no *Managua* log books or crew lists during discovery from which the existence or identity of Captain Robakis could have been learned. The evidence produced by plaintiffs at trial, moreover, was designed to demonstrate what had happened to the *Managua* after it reached Acajutla: no evidence was introduced concerning the prior history of that vessel. Defendants, moreover, claim that the sole source of their knowledge of the possibility that the *Managua* had been used as a Somocista gun boat was Albert Griffith, the man who denied at trial any such knowledge. Even if defendants learned of the rumored use of the *Managua* as a gunboat from other sources, knowledge of such use was denied by the person (other than a *Mana-*

*gua* crewman) most likely to know of it. As the vessel's arrival in El Salvador was delayed for several days, and as the vessel had been engaged in activities which could have led to its loss, it seems probable that the use of the *Managua* as a Somocista gunboat would have been made known to Griffith, Mamenic's agent in El Salvador. Defendants claim, however, that they first learned of the activities of the *Managua* prior to its arrival in El Salvador from a person having first-hand knowledge thereof when Captain Robakis *contacted them* after trial.

Even if the defendants in the exercise of due diligence could have discovered the evidence to be offered by Captain Robakis, defendant's motion for a new trial would not be denied. Given the distinct possibility that plaintiffs herein knew of any prior use of the *Managua* as a Somocista gunboat and concealed such use from this Court, a new trial must be ordered on the basis of defendant's newly discovered evidence to prevent the miscarriage of justice.

At trial, plaintiffs called three witnesses who reasonably could be thought to have known of the use made of the *Managua* by the Nicaraguan military in May, 1979. The first of these was Fausto Amador, former General Manager of Mamenic. The second was Albert Griffith. The third was Vincente Chavez, Griffith's General Manager. As noted above, the *Managua* put into Acajutla several days late, after having been used in a manner which could have led to its loss. The *Managua,* moreover, was allegedly so used on the orders of General Somoza—the President of Mamenic. Under these circumstances, it seems likely that the use of the *Managua* as a Somocista gun boat would have been made known to the General Manager of Mamenic and Mamenic's agents in El Salvador. It also seems probable that these witnesses would have informed plaintiffs or their counsel of the May, 1979 use of the *Managua.*

Given the great likelihood that plaintiffs knew of the prior use of the *Managua* by the Nicaraguan military and concealed it from this Court, a new trial would be warranted on the basis of defendant's newly discovered evidence even in the absence of a showing of "due diligence." Such a proceeding would be justified in order to prevent a miscarriage of justice, namely the commission of fraud on this Court. The evidence on which defendants base their motion, moreover, is practically conclusive in establishing the May, 1979 use of the *Managua* as a gunboat: this motion thus falls within the *Niedland* ("conclusive evidence") restriction on the application of the *Ferrel* (prevention of miscarriage of justice justifies new trial even in the absence of due diligence showing) rule.

The newly discovered evidence on which defendants predicate this motion is clearly material, and is neither cumulative nor impeaching. Thus, the only remaining issue this court must address in deciding this motion is whether introduction of that evidence at a new trial would likely result in a judgment in favor of the defendants. This Court concludes that defendants' newly discovered evidence would likely produce such a result, for several reasons.

First, the use of the *Managua* as a gunboat by Nicaraguan military forces might well have been the proximate cause of the barratry which occurred shortly thereafter on all four vessels forming the subject matter of this action. Defendants contend that the seizure of those ships was ordered by the Sandinista command to prevent the (repeated) use of any of them to shell Sandinista positions on the Nicaraguan coast. If defendants can prove that the Somoza government's act of commandeering the *Managua* touched off the "capture" of all four vessels by the Sandinistas, then such requisition resulted in the loss of which plaintiffs complain.

The Somoza regime has been held to have been the government of Nicaragua at the time the four vessels were seized. *Ope Shipping, Ltd. v. Allstate Insurance Co., Inc.,* 687 F.2d at 643. If the loss of which plaintiffs complain was a result of the seizure of the *Managua* by the Somoza government, then that loss was "incurred as a consequence of … seizure … by the

Government ... of the country in which (the vessels were) owned or registered."[1] As such, plaintiffs' loss would not be covered by the war risk insurance policy issued by the defendants.

Even if defendants are unable to show that the use of the *Managua* to bombard Sandinista positions precipitated the capture of all four vessels by Sandinista elements, defendants' introduction of evidence of that use at a new trial would probably produce a result different from that which currently stands. Defendants contend that the war risk policy provided for automatic termination of coverage of any vessel requisitioned "for title or use." As defendants' newly discovered evidence would indicate that the *Managua* was requisitioned for use, the asserted terms of the war risk policy likely operated to terminate coverage of the *Managua* prior to its seizure by Sandinista elements. Plaintiff Agua Shipping, Ltd., therefore, probably cannot recover the value of the *Managua* on the basis of that policy.

Defendants have discovered evidence in existence at the time of trial which they could not have discovered through the exercise of due diligence. Even if that evidence through such exercise could have been located, its introduction at a new trial is warranted by the need to prevent a miscarriage of justice. The evidence on which a new trial is sought is material, and neither cumulative nor impeaching. That evidence, moreover, would likely produce a result different than the one arrived at by the Second Circuit in that it indicates that the seizure of the vessels might have been precipitated by the seizure of the *Managua* by the Government of the nation in which it was registered and possibly owned. That evidence, moreover, almost certainly bears on the responsibility of the defendants to plaintiff Agua Shipping, Ltd.

A new trial may be granted at this stage. The Second Circuit remanded this action to this Court, with instructions to enter a monetary judgment in favor of the plaintiffs. Thereafter, this Court ordered a hearing on the quantum of damages. Plaintiffs sought a mandamus against such an evaluation, contending that the policies of the insured mandated a valued result in the amount expressed in the coverage. The Court of Appeals denied the mandamus sought and the assessment of loss was referred for hearing to a Magistrate. An initial hearing was held thereon on November 21, 1983.

■ There is no doubt that when a court of appeals remands a case for further proceedings not inconsistent with its opinion, a district court may order a new trial thereon, on the basis of newly discovered evidence. *Lane v. Missouri-Kansas-Texas Railroad Co.,* 223 F.2d 159, 160 (5th Cir.1955).

■ On remand after appeal, a district court may not change the law of the case established by a court of appeals on the basis of new evidence. *United States v. Fernandez,* 506 F.2d 1200, 1202 (2d Cir. 1974). A trial court, however,

> may consider matters not expressly or implicitly part of the decision of the court of appeals. [Citations]. This is true also at a later stage in the litigation where the case is again before the trial court not on remand but, for example, on a new motion to vacate the judgment.

*United States v. Cirami,* 563 F.2d 26, 33 (2d Cir.1977).

The Second Circuit's opinion remanding this matter rests on the conclusion that the

1. As noted above, all four vessels were registered in Nicaragua at the time of seizure. The *Honduras,* moreover, was owned by a Nicaraguan corporation. While the *Managua* itself was owned by a Panamanian corporation, the requisition of that vessel for military purposes by the president and major shareholder of the corporation which owned it, unaccompanied by notice to the insurers of that vessel that it was put to such use, might well constitute "such fraud or misrepresentation ... perpetrated on the defendants as would make it inequitable to hold them to the terms of their contracts," thus justifying disregard of that corporate entity. *See Ope Shipping, Ltd. v. Allstate Insurance Co., Inc.,* 687 F.2d at 642. A finding that the corporation which owned the *Managua* at the time it was seized was an alter ego of General Somoza would lead inexorably to the conclusion that the *Managua* was owned in Nicaragua.

Sandinista Junta was not the government of Nicaragua when the four vessels were seized. Nothing in this Court's opinion disturbs this holding: this Court finds only that newly discovered evidence indicates that actions of the Somoza regime (apparently the government of Nicaragua at the time the vessels were seized) may account for the losses of which plaintiffs complain.

In this Court's opinion disposing of defendant's present motion, no finding of the Second Circuit is disturbed. This Court does not alter the holding of the Court of Appeals that "the district court should not have disregarded the corporate existence and titles." This Court, rather, in its original determination, suggested that evidence supporting a finding of fraud or misrepresentation exists concerning the paper ownership of the vessels. In recognition of and accepting the appellate holding as to the ownership of the vessels, there is, nonetheless, ground based on the use of the *Managua* as a gunboat for an ultimate finding of non-liability on the insurance.

 Had defendants discovered their proposed evidence at a later stage, i.e., at a time too late to bring this motion for a new trial, they could have moved this Court for relief from judgment on the basis of newly discovered evidence, pursuant to Fed.R. Civ.P. 60(b)(2). A district court may grant relief from judgment under that rule, even when the judgment from which relief is ordered is entered by a circuit court of appeals. *Bailey v. Ryan Stevedoring Co., Inc.,* 443 F.Supp. 899, 900–01 (M.D.La.1978), *rev'd on other grounds,* 613 F.2d 588 (5th Cir.), *reh'g denied,* 618 F.2d 781 (5th Cir. 1980), *cert. denied sub nom. Locals 1830 & 1833, General Longshore Workers v. Bailey,* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981). This Court cannot reasonably be thought to be precluded from ordering a new trial by operation of the remand order of the Court of Appeals, when that order would not bar this Court from granting a motion for relief from judgment.

A new trial of this action is ordered and this Court's order referring to Magistrate Washington the ascertainment of damages is vacated.

In the conduct of pre-trial discovery, all parties are directed to address the following factual issues among any others which may be pursued: to what extent were plaintiffs' witnesses at the first trial herein aware of the alleged May, 1979 use of the *Managua* as a gun boat; to what extent were plaintiffs or their representatives aware of that use; and why did Sandinista elements seize the four vessels involved in this action in June, 1979?

SO ORDERED.