**Frank B. MINELLI d/b/a Swiss Craft, Plaintiff,**

v.

**FRANK B. HALL & CO. OF MISSOURI, INC., Mutual Marine Office of the Midwest, Inc. and Utica Mutual Insurance Company, Defendants.**

**No. 92 C 4397.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 30, 1995.

---

James A. Davids, David Allen Shaneyfelt, Bruce J. Van Heufelem, Hoogendoorn, Talbot, Davids, Godfrey & Milligan, Chicago, IL, and Joseph John Gleason, Lakeland, FL, for plaintiffs.

Theodore C. Robinson, Michael A. Snyder, Richard Alan Forster, Ray, Robinson, Calle, Davies & Snyder, Chicago, IL, Steven Brian Belgrade, Belgrade & O'Donnell, Chicago, IL, and Daniel Gene Wells, Pretzel & Stouffer, Chtd., Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Frank Minelli (Minelli) brought this admiralty action against defendants Frank B. Hall & Co (Hall) and Mutual Marine Office of the Midwest, Inc. (Mutual) alleging breach of a marine insurance con-

tract. Minelli alleges that defendants have wrongly refused to pay for the damages resulting from the barratry by the master of one of his vessels. Before us is now is Minelli's motion for partial summary judgment. For the reasons set forth below, the motion is denied.

### BACKGROUND

From the mid–1970s to 1989, Minelli, through his company, Swiss Craft Professional Painters (Swiss Craft), was in the business of painting and refurbishing dams. Minelli owned a floating plant which he could pilot to various jobsites in order to work on the dams. On February 19, 1988, the U.S. Army Corps of Engineers (Corps) awarded Minelli a two-year contract to paint and sandblast two dams along the Arkansas River.

In order to successfully complete the Corps contract, Minelli needed to further develop his plant. He received financing from the Florida National Bank (FNB) to fund the upgrade, in exchange for a security interest in all his vessels and equipment. Minelli also obtained individual sureties through a private bonding company for the performance of the Corps contract and the payment of his debts.

Jeff Daily (Daily) owned and operated a landing along the Arkansas River, fifteen miles down-river from the first dam site. Daily operated a small fleeting and harbor business named Daily & Son's Marine, through which he moored barges and operated a tug boat for various commercial purposes. As part of his business, Daily leased a barge affixed with a crane to businesses that had been awarded contracts to work on dams on the Arkansas River.

When Daily heard that Minelli was awarded a contract by the Corps he contacted Minelli and offered to rent him his barge and crane, in addition to the use of his landing, fleeting vessels, and tug service. Soon thereafter, Minelli agreed to purchase one of Daily's vessels and to fleet his plant at Daily's landing from November 1988 to March 15, 1989. In the meanwhile, Minelli obtained marine insurance from Hall to cover his vessels and equipment for the period March 31, 1989 to March 30, 1990. Hall in turn bound coverage for Minelli with Mutual.

In early March 1989, Minelli and his crew left Daily's landing with the plant and proceeded to the first jobsite up-river. Soon thereafter Daily transported to the jobsite his crane barge, which Minelli agreed to rent. Almost immediately after Minelli arrived at the jobsite, problems developed between him and the Corps. Subsequently, on July 18, 1989, the Corps notified Minelli that it was terminating the contract.

Because he lost the contract Minelli needed to fleet his plant and contacted Daily for that purpose. Daily agreed and Minelli once again transported his plant to Daily's landing. Minelli intended to store his plant at Daily's landing until it was needed at a new jobsite. Although Daily was given some privileges with Minelli's equipment (for example, he had access to Minelli's tugboat and use of his crane), Minelli alleges that he instructed Daily not to release his equipment to anyone without his prior approval.

After the Corps terminated his contract Minelli contacted Thomas Rhoades (Rhoades), his surety, and informed him that he would try to line up a different contractor to complete the job. Meanwhile, Rhoades took it upon himself to find a replacement contractor and contacted Dean Norvell (Norvell) of Skyline Painting, Inc. (Skyline) to take over the Corps contract. Norvell was receptive to the idea and went to Daily's landing to inspect Daily's and Minelli's equipment to determine whether he needed any of it to do the job. Norvell determined that Minelli's equipment was essential for the successful completion of the job. He so informed Daily, and told Daily that he would not lease Daily's equipment without first acquiring Minelli's equipment. On August 10, 1989, Norvell signed a contract with Rhoades to complete the Corps project.

Word of the Rhoades/Norvell agreement had apparently leaked out, for in September 1989 an official from FNB called Daily and told him not to release Minelli's equipment to anyone else. FNB's call apparently made an impression on Daily, who was already nervous about releasing Minelli's equipment

without his permission. Consequently, two days before Minelli's plant was scheduled to be sent up-river, Daily contacted Rhoades and insisted upon receiving "something in writing" authorizing him to turn over the equipment. Rhoades then faxed Daily a letter written by him stating that he had a right to Minelli's property as Minelli's performance surety and further promised to reimburse Daily for any problems that might develop with Minelli.

On September 23, 1989, Minelli first learned of Daily's plan to release his plant without compensation.[1] The next day Minelli wrote Daily and instructed him not to release his equipment without his prior approval. Daily testified that he did not receive that letter prior to his departure to the jobsite. On September 26, 1989, Daily piloted his tug to tow Minelli's two barges and a barge of Daily's to the jobsite, with Andrews, Minelli's former employee and Skyline's agent, assisting with Minelli's tug. Thus, by the end of September Minelli's plant was in Skyline's hands.

In November 1989, FNB filed a replevin action seeking the return of Minelli's equipment. FNB's efforts proved successful and it was awarded possession of Minelli's plant. FNB later sold the property.

Minelli brought this action against his insurers, Hall and Mutual, alleging that Daily's actions in delivering his plant to Skyline was a "barratry of the master," which is a covered peril in Minelli's insurance policy. Minelli filed this motion for partial summary judgment, seeking a declaration that Daily's actions constituted barratry, within the meaning of the marine policy. Defendants respond with three arguments: (1) that Daily was not the master of Minelli's plant; (2) that even if Daily is considered a master, his actions were not barratrous; and (3) that Daily's relationship with Minelli was that of a bailment rather than master/owner. Because defendants' first and third arguments are related we will consider them together before addressing the second argument.

## DISCUSSION

Minelli's insurance contract covered him for losses resulting from "barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel(s) named herein." Minelli alleges that by releasing his plant to Skyline, Daily committed barratry of the master as the term is used in the policy.

Barratry is a concept that dates back hundreds of years, some say as far as medieval times. *Shell Int'l Petroleum Co., Ltd. v. Gibbs*, 2 Lloyd's L.R. 316, 324 (1981). Indeed, it has been a standard "peril" in marine insurance policies since the early part of the eighteenth century. Consequently, a basic definition of barratry is not difficult to find. In *Marcardier v. Chesapeake Ins. Co.*, 12 U.S. (8 Cranch.) 39, 3 L.Ed. 481 (1814), the Supreme Court defined barratry as "an act committed by the master or mariners of a ship for some unlawful or fraudulent purpose, contrary to their duty to the owners, whereby the later sustain an injury." Unlike other primeval legal concepts, the definition of barratry has undergone only a modest evolution—it is now generally accepted that

> "Barratry ... is a generic term which includes many acts of various kinds and degrees. It comprehends any unlawful, fraudulent or dishonest act of the master or mariners, and every violation of duty by them arising from gross and culpable negligence contrary to their duty to the owner of the vessel and which might work loss or injury to him in the course of the voyage insured...."

*National Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177, 183 (4th Cir.1958), *cert. denied*, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958); *see also Fishing Fleet, Inc. v. Trident Ins. Co.*, 598 F.2d 925, 928 (5th Cir.1979); *United States Fire Ins. Co. v. Cavanaugh*, 732 F.2d 832, 835 (11th Cir.1984) (defining barratry to include a master's failure to follow the instructions of the owner, gross negligence of the master which injured the owner, and a master's fraudulent or unlawful conduct which injured the owner), *cert.*

---

1. It appears that Minelli was apprised of Daily's intention by Matt Andrews (Andrews), a former employee who had been hired by Skyline to help finish the Corps project.

*denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984).

■ Neither party disputes the general definition of barratry delivered in *Marcardier,* or the more specific definition found in *National Union.* Based on these cases, Minelli must establish three elements in order to establish that Daily committed barratry: (1) that Daily was a master or mariner of his plant [2], (2) that Daily acted with some unlawful or fraudulent purpose, with gross negligence, or contrary to Minelli's instructions, and (3) that as a direct result Minelli suffered an injury.[3] Defendants challenge Minelli only on the first two elements.

### A. Was Daily a "Master"[4] of Minelli's Plant?

■ Defendants argue that Daily was not the master of any vessel owned by Minelli, but rather was the bailee of his plant. Defendants claim that Minelli entrusted his plant to Daily for storage only and that at no time did either party intend for Daily to captain the vessels.

The issue of whether an individual qualifies as a master for barratry purposes is one of first impression and there is little caselaw that helps govern our decision here. Indeed, in most barratry cases the existence of a master/owner relationship is so obvious from the facts that the courts do not pause to analyze the issue. In this case, however, it is not obvious that Daily was the master of Minelli's vessels and some standard must be employed to determine whether this threshold element is met.

Minelli urges us to adopt a relaxed test for determining whether someone is a master. He alleges that any time a ship owner knowingly entrusts another with the possession of his vessel a master/owner relationship has been established. Naturally, defendants argue that Minelli's definition is far too broad. They assert that if the relationship at issue can be characterized as a bailment, then it cannot constitute a master/owner relationship for barratry.

We find neither proposed standard helpful. First, Minelli's definition is too broad. The very nature of barratry by the master is a breach of the duty owed the owner by the master. *National Union Fire Ins. Co.,* 254 F.2d at 183. It is the relationship between the parties that establishes this duty. *Id.* Mere possession of a vessel does not establish such a relationship. An example helps demonstrate the point. If Minelli piloted his boat to a landing and left it in the care of a mechanic to repair some malfunctioning equipment and the mechanic subsequently took the vessel on a joy-ride causing the owner injury, no one would claim that the mechanic was the master of the vessel for barratry purposes. Indeed, it is difficult to believe that the parties to the insurance contract would have intended coverage for barratry to include such a situation. It is clear that something more than possession is required.

On the other hand, defendants' bailment standard is also misguided. The basic definition for a bailment is the delivery of goods by the bailor to the bailee with the understanding that the bailee will safeguard the goods and utilize them only for a special purpose and will ultimately return the goods to the bailor. *Black's Law Dictionary,* at p. 179 (4th Ed.1979). The fundamental problem is that *any* master/owner relationship can be

---

**2.** We use the word "plant" because the parties so describe Minelli's powered vessel, barges and related equipment.

**3.** Courts examining causation in marine insurance contracts have long held that "the immediate not the remote cause is considered." *Tillery v. Hull & Co., Inc.,* 876 F.2d 1517, 1519 (11th Cir.1989). This is a stricter notion of causation than the concept of proximate cause. *Id.* (collecting cases). This more exacting standard of causation has been frequently applied when barratry is alleged. *Id.; but see United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832, 838 (11th Cir.1984) (Hill, J., dissenting) (speculating as to a possible barratry exception to the more exacting admiralty causation standard).

**4.** We recognize that Daily may be either the master or a mariner to satisfy the first element of barratry. *See Ope Shipping, Ltd. v. Allstate Ins. Co.,* 687 F.2d 639 (2nd Cir.1982) (acts by crew without the aid of the master constituted barratry), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983). However, for the sake of convenience we will refer only to Daily's alleged status as master.

viewed as a bailment. The owner delivers the goods (the vessel) to the master for a special purpose (for example, shrimp fishing), to safeguard and return the goods when the special purpose is complete. *See United States Fire Ins. Co.*, 732 F.2d 832 (master committed act of barratry by taking shrimping boat beyond the navigational limit imposed by owner). Thus, it cannot be that any relationship definable as a bailment is precluded from qualifying as a master/owner relationship for barratry purposes. Therefore, we reject defendants' bailment test for determining who qualifies as a master.

Thus we must derive our own standard for determining whether a master/owner relationship exists. Fortunately, we need not provide the exact contours of this standard because we find that Daily was clearly not a master or mariner of Minelli's vessel. In so doing we rely to a certain degree on the law of agency.

Barratry is based on the relationship between the master and the owner. If one were to put this relationship on a continuum, with the strongest fiduciary relationship at one end and the weakest at the other, the relationship between a master and an owner is at least as strong, and likely stronger, than that of an agent and a principal. The touchstone of an agent/principal relationship is the ability of the principal to control the conduct of the agent. *Restatement (2d) of the Law of Agency* at § 2; *see also Valenti v. Qualex, Inc.*, 970 F.2d 363, 367–68 (7th Cir.1992). Here, Minelli did not have the ability to control Daily's conduct at a level necessary to support the existence of even an agent/principal relationship. Minelli could not have instructed Daily to pilot the vessel to a specific location, to show the boat to potential buyers, to hire a crew, or any other task related to Minelli's operations. In addition, at no time was Daily an employee of Swiss Craft, and at no time did Daily pilot any vessel at Minelli's direction. Although Minelli did testify that he instructed Daily not to release the equipment without his permission, this allegation alone does not establish the level of control over Daily's conduct that is needed for the creation of an agency relationship. It follows, *a fortiori*, that Daily was not a master of Minelli's plant.

Moreover, as a practical matter there is little doubt that Minelli did not intend for Daily to be the master of his plant, nor did Daily intend to assume that role. Minelli did not entrust the operation of his plant to a faithless captain. Minelli admits that the only reason he went to Daily was to store his plant. There is nothing in the record that suggests that Minelli and Daily ever contemplated that Daily would be a master of the plant. We need not hold that the intent of the parties controls whether a master/owner relationship is formed, but it is clear that such an intent is a relevant consideration. *See Restatement (2d) of the Agency* at § 15 (manifestation of intent to form relationship is necessary to create agency relationship). Therefore, we find that Daily was not the master or a mariner of Minelli's plant and, consequently, there was no barratry.

Minelli presents two additional arguments. First, he claims that even if his storage of his plant at Daily's landing did not create a master/owner relationship, then one was created when Daily took the plant upstream to the jobsite. We disagree. When Daily took the plant to the jobsite, he was acting under the direction of Rhoades and Skyline, not Minelli. In fact, Minelli has maintained that he instructed Daily not to take the plant upstream. If Daily was not a master before he took the plant upstream, he did not become one by his unilateral, unauthorized actions undertaken at the direction of a third party. Indeed, under Minelli's view a stranger could steal his plant from the landing and somehow create the relationship between a master and an owner. That simply cannot be the case.

Second, Minelli claims that the insurance contract is ambiguous as to the definition of "master" and that all such ambiguities must be interpreted in favor of the insured. It is well established that ambiguities in insurance contracts should be interpreted in favor of coverage. *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1040 (7th Cir.1992). But it does not follow that the insured wins every

close case. Rather, the rule is a tool of contract interpretation that helps resolve ambiguities in insurance contracts. The word "barratry," however, is not ambiguous; its definition has been universally accepted for hundreds of years. When two parties use a term that has been in existence that long they use it as a shorthand for its universally accepted definition. In addition, who qualifies as a master is an issue of admiralty law, not an ambiguity in the contract. Thus, we hold that the phrase in the policy "barratry of the master and mariners" is not ambiguous and therefore Minelli is not entitled to have it interpreted in his favor.

### B. *Was Daily's Conduct Barratrous*

Even assuming Daily was the master of Minelli's vessel, we would still deny Minelli's motion because there are genuine issues of material fact whether Daily committed barratry by releasing Minelli's plant to Skyline.

■■■ As was explained above, to have committed barratry Daily must have either acted with some unlawful or fraudulent purpose, contrary to Minelli's instructions, or with gross negligence. *National Union Fire Ins. Co.*, 254 F.2d at 183; *see also Tillery v. Hull & Co., Inc.*, 717 F.Supp. 1481, 1483 (M.D.Fla.1988). Simple negligence by the master is not enough for barratry. *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.*, 598 F.2d 925, 928 (5th Cir.1979). Finally, determining whether an act constituted barratry is a question of fact. *See Darien Bank v. Travelers Indemnity Co.*, 654 F.2d 1015, 1019 (5th Cir.1981); *see also Tradewinds Marketing v. General Acc. Ins. Co.*, 665 F.Supp. 104, 105 (D.P.R.1987), *aff'd*, 843 F.2d 58 (1st Cir. 1988).

■■■ It is clear that Minelli cannot prevail on this motion for summary judgment. Minelli claims that Daily knew that he should not have released the plant but did so only for selfish reasons—to ensure that Norvell would lease his crane. Thus, Minelli argues, Daily acted contrary to the instructions of the owner and in his own self-interest. Defendants, however, have presented enough evidence that Daily was an innocent actor in this drama to create a genuine issue of fact. Daily received a letter from Rhoades advising him that Rhoades, as Minelli's performance surety, had the right to take possession of Minelli's vessel after the Corps terminated the contract. Daily testified that this advice comported with his own understanding of the role of the surety in Corps contracts. Was this a case of reasonable, albeit mistaken, reliance on another's authority, *see Commercial Trading Co. Inc. v. Hartford Fire Ins. Co.*, 466 F.2d 1239 (5th Cir.1972) (reasonable reliance by master on another's authority does not qualify as fraudulent or dishonest), or was it something more sinister? We simply cannot say as a matter of law that Daily was dishonest or fraudulent in releasing Minelli's plant. Nor can we say as a matter of law that Daily was grossly negligent. Such determinations await the trier of fact. Therefore, we hold that there are genuine issues of material fact whether Daily's decision to release Minelli's equipment was the result of fraud, dishonesty, or gross negligence.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied.