**Jack TILLERY, Plaintiff,**

v.

**HULL & COMPANY, INC., La Reunion Francaise, Paul Edward Miller, Dean Miller, Louis Albert Abend, and John Doe, an unknown person or persons, Defendants.**

**No. 84–1386–Civ–T–17.**

United States District Court, M.D. Florida, Tampa Division.

April 30, 1988.

---

Nathaniel G.W. Pieper, Lau, Lane, Pieper & Asti, P.A., Tampa, Fla., for plaintiff.

William F. McGowan, Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tampa, Fla., for defendants Hull & Co., Inc. and La Reunion Francaise.

## MEMORANDUM DECISION

GAGLIARDI, Senior District Judge.

This is an admiralty action brought by a boat owner to recover the face amount of a policy of insurance issued by defendant La Reunion Francaise through its general agent, defendant Hull & Company, Inc., for constructive total loss or damage to his commercial fishing vessel, the Texas Pride. Defendants deny liability on the policy, based primarily on their defense that the claim is excluded from coverage by the Free of Capture and Seizure provision ("FC & S") of the policy. The case was tried to the court and the following constitutes the findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

### Facts

The facts are either stipulated to or substantially undisputed and are found as follows:

In March 1983 plaintiff contracted with Captain Paul Edward Miller to fish the Texas Pride in the coastal waters of the state of Florida.[1] The contract included a provision for navigational limits not exceeding 200 miles off-shore, limits which were prescribed in plaintiff's insurance policy. The contract also prohibited the ship from

---

1. Paul Edward Miller failed to appear and default judgment was entered against him pursuant to Fed.R.Civ.P. 55(b)(2). Defendants Dean Miller and Louis Albert Abend made up the crew of The Texas Pride and agreed with Captain Miller to take the vessel to Jamaica. These defendants were not served with process. John Doe remains unknown.

carrying illegal or controlled substances. Unfortunately, neither of these limitations was observed by Captain Miller who, for the purpose of picking up a shipment of marijuana, proceeded to take the Texas Pride to Jamaica. The boat was subsequently seized in April 1983 by the Jamaican authorities who stripped it of its gear and equipment. Prior to the seizure, there was no damage done to the vessel. The Jamaican authorities held three forfeiture hearings concerning the Texas Pride shortly after its seizure. Rip Tillery, plaintiff's son and the manager of his fishing business, was instructed to attend these hearings by the insurance company. In May, 1983 an order of forfeiture of the Texas Pride was entered by the Magistrate's Court in Jamaica and the boat became the property of the Jamaican government. The insurance company cancelled plaintiff's policy on the Texas Pride. There remains the question of whether plaintiff is entitled to a pro rata premium refund. This issue is discussed below in the damages section.

In February of 1984, the insurance company paid $30,000.00 for the release of the Texas Pride from the Jamaican authorities. Shortly afterward, again acting on the insurance company's instructions, Rip Tillery flew to Jamaica to assess the damage to the ship and prepare it for return to Florida. In Jamaica he met with marine surveyor Daniel Avoures, an employee of the insurance company. Together Tillery and Avoures conducted a field survey of the Texas Pride to determine which items were missing or damaged. They both signed the field survey "... agree[ing] to the damages" as described therein and agreeing that the cost of these damages was $6,350.00 plus any damage to the diesel engine and transmission.

### Discussion

Initially, the court finds that defendant Hull & Company was acting at all times as an agent for defendant La Reunion Francaise, a disclosed principal, and is not liable to plaintiff. *Port Ship Service, Inc. v. International Ship Management & Agencies Service, Inc.*, 800 F.2d 1418, 1421 (5th Cir.1986); *Seguros Banvenez, S.A. v. S/S*

*Oliver Drescher,* 761 F.2d 855, 860 (2d Cir. 1985).

Defendants concede that the unauthorized and illegal acts of Captain Miller constituted an act of barratry, a peril within the coverage of the insurance policy. Similarly, the fact that, following the barratry, the ship was seized by Jamaican authorities is not in dispute. The main issue as framed by the parties in their pretrial stipulation is "Whether or not the loss or damage sustained by the vessel is attributable to 'barratry of the master and mariners' as contained in the named perils policy or whether the loss is excluded under the 'free of capture and seizure' provisions of the policy or some combination thereof." Plaintiff argues that all the damage to the vessel was proximately caused by the barratry and that the Jamaican authorities' lengthy detention of the vessel constituted a constructive total loss entitling plaintiff to the entire face value of the policy, less salvage value of $40,000. Defendants argue that the barratry and the seizure were two separate events and that the true, efficient cause of the vessel's damage was the seizure by the Jamaican government.

■ Barratry is defined as (1) an act committed by the master or crew of a ship involving deliberate disobedience of the owner's orders; (2) an act committed by the master or crew for some unlawful purpose, contrary to their duty to the owners, thereby causing injury to the latter or (3) every violation of duty by the master or crew arising from gross negligence contrary to their duty to the owner. *United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832, 835 (11th Cir.) *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984); *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.,* 598 F.2d 925, 927 (5th Cir.1979). The acts of Captain Miller clearly fall within the first two prongs of the definition of a barratry.

The problem of barratry, a covered risk, leading to a seizure, an excluded risk, is not a new one in maritime insurance law. In *Cory v. Burr,* 8 App.Cas. 393 (1883) the master of a vessel used it to smuggle to-

bacco into Spain without the permission of its owner. Consequently, Spanish customs officials seized the ship. The owner sued for recovery under a policy which covered acts of barratry but contained an FC & S clause.

During the discussion in the House of Lords, Lord Blackburn stated:

> Now here they are "warranted free from capture and seizure and the consequences of any attempts thereat." It was argued that here they have not been warranted free from barratry. That is true, but the barratry would itself occasion no loss at all to the parties insured. If it had not been that the Spanish revenue officers, doing their duty (they were quite right in that respect), had come and seized the ship, the barratry of the captain in coasting along there, hovering as we should call it along the coast, in order that the small smuggling vessel might come and take the tobacco, would have done the assured no harm at all. The underwriters do undertake to indemnify against barratry; they do not undertake to indemnify against any loss which is directly sustained in consequence of the barratry; and in this case, as I said before, I think the seizure was as direct a consequence of the barratry as could well be. But still, as Mr. Justice Field says, it was the seizure which brought the loss into existence—it was a case of seizure.

8 App.Cas. at 400–401.

The House of Lords concluded that the loss was caused by the seizure and not by the preceding barratrous acts. As a result the insurance company was held not liable for damages to the vessel.

In analyzing cases similar to ours, though not dealing specifically with the barratry/seizure problem, the Supreme Court has said:

> "[T]he doctrine of proximate cause is applied strictly in cases of marine insurance. But in that class of cases, as well as in others, the proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result."

*Lanasa Fruit S. S. & Importing Co. v. Universal Insurance Co.*, 302 U.S. 556, 562, 58 S.Ct. 371, 374, 82 L.Ed. 422 (1938) (Citations omitted). "[P]roximate cause 'does not necessarily refer to the cause nearest in point of time to the loss. But the true meaning of that maxim is, that it refers to the cause which is most nearly and essentially connected with the loss as its efficient cause.'" *Standard Oil Co. v. United States*, 340 U.S. 54, 58, 71 S.Ct. 135, 137, 95 L.Ed. 68 (1950) (Footnote omitted).

Courts applying these principles have eschewed a "but for" analysis of proximate cause and have attempted to apply "common sense and reasonable judgment as to the source of the loss alleged." *Ope Shipping, Ltd. v. Allstate Ins. Co., Inc.*, 687 F.2d 639, 641 (2d Cir.1982) (citation omitted); *Blaine Richards & Co. v. Marine Indem. Ins. Co.*, 635 F.2d 1051, 1055 (2d Cir.1980); *Insurance Company of North America v. John J. Bordlee Contractors*, 532 F.Supp. 774, 785 (E.D.La.1982) *aff'd*, 733 F.2d 1161 (5th Cir.1984).

In *Ope*, four of plaintiff's ships were taken over by revolutionary groups consisting of the captains and crews of these ships. The ships were covered by a marine risk insurance policy which included barratry but specifically excluded loss resulting from civil war. Based on facts found at the trial level, the Second Circuit concluded:

> From a common sense standpoint, it is quite obvious that the unlawful conduct of the four crews was a direct result of the Nicaraguan civil war. The barratrous mariners took control of the ships in the name of the Sandinistas, professed to the acting under orders from the Sandinista regime and, in at least one case, hoisted the Sandinista flag over the ship. The commandeered vessels were taken into the waters of nations known to be friendly to the revolutionary cause and were returned to Nicaragua only after Somoza was ousted and the Sandinistas were in control. Moreover, it is evident, from the concerted nature of the activities, that the seamen acted under orders from a central authority. The district

court did not err, therefore, in holding that the conduct of the crews fell squarely within the exclusions of the marine policy so as to relieve the marine underwriters from liability.

*Ope*, 687 F.2d at 642.

*See also, Nautilus Virgin Charters Inc. v. Edinburgh Ins. Company, Ltd.*, 510 F.Supp. 1092 (D.Md.1981) *aff'd*, 673 F.2d 1314 (1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982).

The only cases which have permitted recovery when a crew's barratry led to the vessel's seizure both included findings that damage to the vessel occurred as a result of the barratry and before the seizure. *Peninsular Fire Ins. Co. v. Wells*, 438 So.2d 46 (Fla.Dist.Ct.App.1983); *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.*, 598 F.2d 925 (5th Cir.1979).

Based on the foregoing analysis of the law, this court concludes that the barratry and the seizure must be analyzed as distinct causes of damage and turns to the question of whether and to what extent the Texas Pride's damages were caused by the covered risk of barratry.

### Damages

■ The uncontradicted evidence at trial was that the Texas Pride was basically intact at the time it was boarded by Jamaican authorities. Therefore, the court finds that the seizure and detention of the vessel by Jamaican authorities was the proximate cause of the damages suffered by the vessel. In addition the damages due to the vessel's deterioration during its detention are damages excluded from coverage by the FC & S provision of the policy.

■ The court also finds that the barratry was the proximate cause of the Texas Pride's arrival in Jamaican waters. Defendant conceded at trial that plaintiff is entitled to recover the cost of its return to Florida, which we find to be $8,891.07.

This figure includes airfare to Jamaica for Rip Tillery and Captain Mecko, the commander of the vessel on its return trip, supplies for the trip, including fuel, expenses in Grand Cayman during the trip, a daily payment of $150 to Captain Mecko for 11 days at sea, and a daily payment of $250 to Rip Tillery, also for 11 days at sea. As for the daily payment to Captain Mecko, the uncontradicted testimony of defendant's expert stated that $150 per day was a reasonable cost for the master of a ship. As to Rip Tillery's time at sea, plaintiff claimed $400 per day for this item. Both Rip and Jack Tillery testified that this was the amount that the parties agreed would be paid to Rip Tillery for his time spent in retrieving the ship. However, this amount included Mecko's payment, which reduces his payment to $250 per day. Defendants denied any liability for Rip Tillery's time, either as part of damages for barratry or as expenses under the sue and labor clause, which is discussed below. The court finds no reason why the insured's employee should not be paid for time spent serving his employer and awards plaintiff $250 per day for this item.

Plaintiff also argued that the lengthy detention of the Texas Pride constituted a constructive total loss of the vessel. This argument is defeated on two grounds. First, plaintiff's hull insurance policy defines a constructive total loss as occurring when expense of recovery and repair of the vessel exceeds its agreed-upon valuation; that is, in this case $150,000.00. As stated in the discussion of facts above, the parties agreed that the damage to the vessel was $6,350.00 plus the cost of repairing the engine and transmission. The proof clearly showed that repairs and recovery would not exceed $150,000.00. Second, as discussed above, losses due to seizure and detention are excluded by the FC & S clause of the policy.[2]

---

2. Plaintiffs argued that the defendant had conceded that a constructive total loss had occurred. This argument was based on deposition testimony given by one of defendant's attorneys, Mr. Christopher Fertig. In this testimony, Mr. Fertig stated that there were internal discus-sions as to whether the forfeiture order constituted a total loss of the vessel and that he believed that it did. However, the fact that defendant's attorney once held an erroneous view of the law does not estop defendants from asserting the correct view now. Estoppel does

Also involved is a dispute over payments due plaintiff under the sue & labor clause of the policy.[3] The evidence showed that the insurance company requested that plaintiff, or his representative, attend forfeiture hearings in Jamaica and assist in their preparation. Rip Tillery attended these hearings and subsequently submitted a claim for sue & labor expenses of $7,328.17. He testified that this amount included payment for his time and that, although the insurance company had agreed to pay sue & labor expenses, it would not agree to reimbursement for Rip Tillery's time. The insurance company ultimately determined sue & labor expenses to be $2,528.17. After applying the policy deductible of $2,500.00, the company paid plaintiff $28.17. Plaintiff claims it is owed for Rip Tillery's time under the sue & labor clause.

■ The court concludes that no further payments are owed under the sue & labor clause. "The purpose of the sue and labor clause is to reimburse the insured for those expenditures which are made primarily for the benefit of the insurer to reduce or eliminate a covered loss." *Blasser Brothers, Inc. v. Northern Pan–American Line*, 628 F.2d 376, 386 (5th Cir.1980). "Because the purpose of the clause is to reimburse the assured for expenses incurred in satisfying his duty to the underwriter, there is no such duty where the policy, for one reason or another, does not afford coverage. *The 'sue and labor' clause does not operate as enlargement of the perils un-*derwritten against." *Continental Food Products, Inc. v. Ins. Co. of North America*, 544 F.2d 834, 837 (5th Cir.1977) (emphasis added). The court finds that Rip Tillery's travel to Jamaica in 1983 to attend forfeiture hearings was for the purpose of reducing losses due to the seizure of the Texas Pride. This is also true of the time Tillery spent in June, 1984 repairing damages which had occurred upon seizure and during the Texas Pride's detention. As these damages are not covered by the policy, expenses incurred in mitigating them for the benefit of the insurance company are not recoverable under the sue and labor clause. *See also Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 489 (5th Cir.1960) ("The obligation [to sue and labor] comes into being only when the action taken is to minimize or prevent a loss for which the underwriter would be liable.")

Plaintiff also claims that he is entitled to $3,065.00 in premium payments as an element of damages. Both parties testified that all premium transactions went through AFCO, a premium finance company. Defendant's exhibit 63 was a Hull & Company worksheet showing that on June 15, 1983 instructions to issue a return premium check to AFCO were given. Plaintiff did not produce any evidence to show that this check did not go to AFCO or to show the state of his account with AFCO. Plaintiff did produce a copy of the cashier check made out to AFCO dated later in the summer of 1983, but there was no indication that this check was connected to defendants. Therefore, the court denies this

---

not apply to an admission as to the law. *St. Paul Fire and Marine Ins. Co. v. Vest Transportation Co.*, 666 F.2d 932, 947 (5th Cir.1982). Further, estoppel cannot be used to extend the terms of an insurance contract to provide coverage that is excluded by the policy. *Id.* at 947 to 948.

3. The Sue & Labor clause provides:
    In case of any loss or misfortune it shall be lawful and necessary for the assured, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the vessel named herein, or any part thereof, without prejudice to this insurance, to the charges whereof this Company will contribute as hereinafter provided. It is agreed that the acts of the assured or this Company, or their agents, in recovering, sav-

ing and preserving the property insured in case of disaster shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy; but such acts shall be considered as done for the benefit of all concerned, and without prejudice to the rights of either party.
    In the event of expenditure under the sue and labor clause, this Company will pay the proportion of such expenses that the amount insured hereunder bears to the agreed valuation of the vessel named herein, or that the amount insured hereunder, less loss and/or damage payable under this policy, bears to the actual value of the salved vessel, whichever proportion shall be less.

claim based on its findings that plaintiff has failed to meet his burden of proof on this element of damages.

Plaintiff seeks pre-judgment interest in this case. "The award of pre-judgment interest is the rule in admiralty cases rather than the exception...." *United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832, 835 (11th Cir.) *cert. denied* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). Therefore, pre-judgment interest is awarded at the statutory rate of 12% on the amount awarded as damages for barratry, $8,891.07. Fla.Stat.Ann. § 687.01 (West 1966 & 1987 Supp.). Interest shall accrue from the date at which payment was due under the policy. *Taylor v. New Hampshire Ins. Co. of Manchester,* 489 So.2d 207 (Fla.Dist.Ct.App.1986); *Biscayne Supermarket, Inc. and K.R.D., Inc. v. Travelers Ins. Co.,* 485 So.2d 861 (Fla.Dist.Ct.App. 1986). Lines 105 through 107 of the policy state:

> In case of loss, such loss to be paid in thirty days after satisfactory *proof of loss* and interest shall have been made and presented to this Company, (the amount of any indebtedness due this company from the assured or any other party interested in this policy being first deducted).

No evidence was received at trial concerning when the proof of loss was filed. The last element of damages recoverable by the plaintiff was incurred on July 9, 1984, the date the Texas Pride arrived back in St. Petersburg. Therefore, the court finds that payment of loss would have been due on August 8, 1984, and awards pre-judgment interest on $8,891.07 at the statutory rate of 12%, to accrue from this date.[4]

### Conclusion

Plaintiff is awarded $8,891.07, with pre-judgment interest at a rate of 12% to run from August 8, 1984. Plaintiff is entitled to costs pursuant to Fed.R.Civ.P. 54.

---

**4.** The court concludes that plaintiff's claim for attorneys' fees is a pendent claim pursuant to Florida Insurance Law. *See, Finn v. Gunter,* 722 F.2d 711 (11th Cir.1984). In their Pre–Trial Stipulation, the parties reserved determination of the amount of reasonable attorneys' fees re-

Submit judgment on notice accordingly. So Ordered.

coverable. Fla.Sta.Ann. § 627.428 (West 1972 and 1988 Supp.). If the parties can agree on this amount they are instructed to submit a judgment on consent to this court. If no agreement is reached, the matter shall be referred to a magistrate for determination.