**SWIRE PACIFIC HOLDINGS, INC., Plaintiff,**

v.

**ZURICH INSURANCE COMPANY, Defendant.**

**No. 99–2835–CIV.**

United States District Court, S.D. Florida.

April 20, 2001.

---

Marlene Koch Silverman, Greenberg Traurig, Miami, FL, Ronald W. Kleinman, Greenberg Traurig, Washington, DC, for plaintiff.

Janet Lynn Brown, Boehm Brown Seacrest & Fischer, Maitland, FL, Janet Lynn Brown, Thomas W. Brunner, Leslie A. Pratt, Wiley Rein & Fielding, Washington, DC, for defendant.

## ORDER

TURNOFF, United States Magistrate Judge.

This Cause comes before the Court on a motion for partial summary judgment filed by Plaintiff Swire Pacific Holdings, Inc. (D.E.23) and a motion for summary judgment filed by Defendant Zurich Insurance Company (D.E.35). A hearing was held on these matters on January 10, 2001. Pursuant to the consent of the parties, this case was referred to the undersigned for full disposition of the summary judgment motions (D.E.18). For the reasons stated

below, the Court has determined that there are no genuine issues of material fact, and the undisputed facts demonstrate that Defendant Zurich Insurance Company is entitled to judgment as a matter of law.

## INTRODUCTION

### A. Procedural Background

Plaintiff, Swire Pacific Holdings, Inc. ("Swire"), filed a two-count lawsuit against Defendant, Zurich American Insurance Company ("Zurich"), seeking declaratory and monetary relief (1) to determine Swire's rights to insurance coverage under a Builder's Risk Policy ("the Policy") that Zurich issued to Swire (Count I); and (2) to award money damages to Swire arising out of Zurich's failure to provide coverage for loss allegedly incurred by Swire at a forty-two story, two hundred sixty eight (268) unit residential condominium project known as Two Tequesta Point Condominium (Count II). Zurich filed an Answer and Affirmative Defenses to Swire's Complaint, and as its Fourth Affirmative Defense, Zurich asserted that Swire's damages were specifically excluded from coverage due to an exclusion listed in Part B of the Builders Risk Policy dealing with, *inter alia*, loss or damage caused by design defects.[1]

Swire seeks partial summary judgment on Count I of its Complaint as well as on Zurich's Fourth Affirmative Defense. Swire argues that it is entitled as a matter of law to a declaration that none of the exclusions invoked by Zurich in its Fourth Affirmative Defense apply in any respect to costs incurred by Swire under the Builders Risk Insurance Policy's Sue and Labor Clause, and in the alternative, that the Design Defect Exclusion invoked by Zurich in its Fourth Affirmative Defense

does not exclude any costs for work that necessarily damages or destroys portions of the insured property as a result of required remediation or repair of defective property. In essence, Swire argues that the Sue and Labor clause is a separate insuring provision to which the Design Defect Exclusion does not apply, and alternatively, even if it does apply, the Design Defect Exclusion does not serve to exclude Swire's losses.

Zurich opposes partial summary judgment in Swire's favor and moves for summary judgment in its own favor on the grounds that (1) the Design Defect Exclusion bars coverage for Swire's claim; (2) the Design Defect Exclusion applies to sue and labor expenses; and (3) the Sue and Labor Clause at issue applies only to actual, covered loss or damage.

### B. Factual Background

In its Partial Motion for Summary Judgment, Swire sets forth a Statement of Material Facts as to Which There is No Genuine Issue to be Tried, pursuant to Local Rule 7.5. (D.E. 23. Exhibit A.) Zurich has not specifically disputed these facts, and therefore, pursuant to Local Rule 7.5, they are deemed admitted by Zurich. Zurich, however, contends that these same facts establish that Zurich is entitled to summary judgment. In setting forth the following facts, the undersigned has also taken into account those undisputed facts set forth in the parties' joint status report. (D.E.11.)

On February 24, 1997, Swire purchased from Zurich, Builder's Risk Policy No. IM 20–92–593. This policy, which is commonly referred to in the insurance industry as a "first-party property" policy, covered the

---

**1.** Zurich also asserted a separate exclusion dealing with, *inter alia*, debris removal expenses occasioned by a political body, law or ordinance. This exclusion was not argued as a basis for summary judgment by either party and is not necessary to the disposition of these motions, and therefore, is not addressed by the Court.

period from February 24, 1997 to February 24, 1999. The policy was issued to Swire for the premises known as Two Tequesta Point Condominium ("the Condominium Project"). Swire is among the insureds under the Policy and the Condominium Project is among the property insured under the Policy. In March 1998, Swire was contacted by the City of Miami Building Department concerning Richard B. Klein ("Klein"), the structural engineer on the Condominium Project. At that time, Swire learned that Klein was being investigated in connection with several of his previous design projects insofar as Klein had failed to comply with appropriate governmental building codes and ordinances. Swire's agent, CHM Consulting Engineers, Inc., convened a peer review process (the "Peer Review") to evaluate the structural work completed at the Condominium Project and the potential claim or damage arising from that structural work. While the design of the structure was under review, the City of Miami temporarily halted the issuance of a certificate of occupancy. Ultimately, the Peer Review revealed numerous errors and omissions with respect to the design of the Condominium Project. As a result of the design defects. Swire altered the plans and construction to bring the building into compliance with appropriate governmental building codes. Swire filed a claim with Zurich for its expenses incurred in conjunction with its efforts to remedy the design defects. By letter dated February 2, 1999, Zurich denied coverage for the losses associated with the corrective work on the Project. The letter specifically denied coverage because the claim presented by Swire dealt "with the cost of correcting a design defect and not any physical loss or damage resulting from the defect." (D.E. 23. Exhibit E.) To date, Swire has claimed in excess of $4.5 million for the corrective efforts necessitated by the Peer Review.

*C. The Terms of the Insurance Policy*

The Policy at issue in this case is attached as Exhibit A to Swire's Attachment of Exhibits. (D.E.24.) The policy provisions most significant to the resolution of this matter are the Insuring Agreement, Design Defect Exclusion and Sue and Labor Clause. These clauses provide as follows:

### PART A–COVERAGE

1. *INSURING AGREEMENT:*

Subject to the limitations, exclusions, terms and conditions contained herein, this Policy insures, in respect of occurrences happening during the term of this policy, against: Physical loss or damage to the property insured, except as excluded hereunder.

\* \* \* \* \* \*

### PART B–EXCLUSIONS AND LIMITATIONS

THIS POLICY SHALL NOT PAY FOR:

1. *PERILS EXCLUDED:*

c) Loss or damage caused by fault, defect, error, or omission in design, plan or specification, but this exclusion shall not apply to physical loss or damage resulting from such fault, defect, error or omission in design, plan or specification.

\* \* \* \* \* \*

PART D–CONDITIONS

21. *SUE AND LABOR:*

In case of loss or damage, it shall be lawful and necessary for the INSURED ... to sue, labor and travel for, in and about the defense, safeguard and recovery of the insured property hereunder or any part thereof without prejudice to this insurance.... The expenses so incurred shall be borne by the INSURED and the Company proportionately to the extent of their respective interests.

Any payment made pursuant to their [sic] clause, shall not serve to increase the Limit of Liability at the project site, as stated on the Declarations Page.

### D. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" if it is a legal element of a claim under the applicable substantive law and is one that might affect the outcome of the suit under the governing law. *Id.* at 248, 106 S.Ct. 2505. A material fact is "genuine" if "the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Id.* at 261 n. 2, 106 S.Ct. 2505 (citations omitted).

A properly supported motion for summary judgment cannot be defeated absent an affirmative presentation of specific facts showing a genuine issue exists, and may not be opposed by reliance on the general allegations of the pleadings. *See id.* at 256, 106 S.Ct. 2505. A mere scintilla of evidence is insufficient to defeat a motion for summary judgment:

> [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.

*Id.* at 251, 106 S.Ct. 2505. In reviewing a motion for summary judgment, the Court focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (*quoting Anderson, supra*).

To determine whether a genuine issue exists to preclude summary judgment, federal courts employ the two-prong framework of burden shifting established by the Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This framework places the initial burden on the moving party to establish the absence of a genuine issue as to any material fact. *See Allen,* 121 F.3d at 646 (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The moving party may discharge this burden by "showing— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. To decide whether the burden has been satisfied, the Court must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *See Schoenfeld v. Babbitt,* 168 F.3d 1257, 1264 (11th Cir.1999).

Once the movant has satisfied its burden, the burden shifts to the nonmoving party to present evidence sufficient to make a "showing that the jury could reasonably find for that party." *Allen,* 121 F.3d at 646 (*quoting Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990)). Facts asserted by a summary judgment opponent must be regarded as true if supported by affidavit or other evidentiary material. *See Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir. 1981). The nonmoving party's failure to prove an element essential to that party's case, and on which that party will bear the burden of proof at trial, is fatal, warranting summary judgment for the movant. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "In such a situation, there can be

'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.; see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen,* 121 F.3d at 646 (citations omitted).

### ANALYSIS

The two questions presented in this matter are: (1) is Swire's loss excluded by the Design Defect Exclusion; and (2) what effect, if any, does the Sue and Labor Clause have on the availability of coverage for Swire's loss. If Swire's loss falls outside of the Design Defect Exclusion, then Swire will be afforded coverage irrespective of the Sue and Labor Clause. If the loss is excluded by the Design Defect Exclusion, however, the Court must then analyze whether the Sue and Labor Clause provides coverage for Swire's loss.

### I. The Design Defect Exclusion

The first issue the Court must address is whether Swire's loss is excluded by the terms of the Design Defect Exclusion. This provision excludes coverage for "loss or damage caused by fault, defect, error or omission in design, plan, or specification," but provides that "this exclusion shall not apply to physical loss or damage resulting from such fault, defect, error or omission in design, plan or specification." Policy at Part B(1)(c). To determine whether coverage is excluded under this provision, the Court must first determine whether Swire's claim falls under the exclusion portion of the provision, *i.e.,* whether the claim is for "loss or damage caused by fault, defect, error or omission in design, plan, or specification." If so, then the Court must determine whether the claim is

excepted from the exclusion, *i.e.,* whether the claim is for "physical loss or damage resulting from such fault, defect, error or omission in design, plan or specification."

### A. The Design Defect Exclusion is Unambiguous

Swire claims that the costs it incurred in, *inter alia,* demolishing non-defective portions of the building in its efforts to correct the defective design, constitute "physical loss or damage resulting from such fault, defect, error or omission in design, plan or specification," and therefore fall within the exception to the Design Defect Exclusion. In so arguing, Swire asserts that the provision is ambiguous as a matter of law. Thus, claims Swire, in accordance with Florida law, the Court must construe the exclusion narrowly and in favor of coverage.

 Swire is correct that under Florida law, any ambiguities in an insurance policy must be construed in favor of coverage. *See, e.g., Prudential Property & Cas. Ins. Co. v. Swindal,* 622 So.2d 467, 471 (Fla. 1993); *Stuyvesant Ins. Co. v. Butler,* 314 So.2d 567, 570 (Fla.1975). A court, however, must not rewrite the terms of the policy to create an ambiguity where none exists. *City of Delray Beach v. Agriculture Ins. Co.,* 85 F.3d 1527 (11th Cir.1996). In addition, an exception cannot be construed so broadly so as to swallow up the exclusion. *See, e.g., Laquila Construction, Inc. v. Travelers Indemnity Co.,* 66 F.Supp.2d 543 (S.D.N.Y.1999), *aff'd mem.,* 216 F.3d 1072 (2d Cir.2000); *Narob Dev. Corp. v. Insurance Co. of N. Am.,* 219 A.D.2d 454, 631 N.Y.S.2d 155, 156 (1995). The mere fact that an insurance policy is a complicated document which requires a thorough analysis to determine its meaning does not imply ambiguity. *Delray Beach,* 85 F.3d at 1531. Furthermore, the absence of a definition of a particular term does not necessarily mean that term is

ambiguous. *Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Co.,* 711 So.2d 1135, 1139 (Fla.1998).

The first portion of the Design Defect Exclusion ("loss or damage caused by fault, defect, error or omission in design, plan, or specification") is straightforward. By its very terms, it unambiguously and broadly excludes loss caused by defective design. *Cf. Deni,* 711 So.2d at 1138 (absolute pollution exclusion is unambiguous). Swire does not appear to argue that the exclusion portion of the clause is ambiguous. Rather, Swire focuses its ambiguity argument on the exception portion of the exclusion, which is commonly referred to as an "ensuing loss provision." Swire claims that the exception is ambiguous because "a reasonable policyholder could interpret it as confirming coverage for any physical loss resulting from a design defect." (D.E. 23 at p. 25.) Several courts, however, have found this exception to be unambiguous. *See Laquila,* 66 F.Supp.2d at 543; *Allianz Ins. Co. v. Impero,* 654 F.Supp. 16 (E.D.Wash.1986). In *Laquila,* an exclusion in the policy at issue contained an exception for ensuing loss almost exactly the same as the instant exception. The insured argued that the exception provision was ambiguous. The *Laquila* court, however, found it to be unambiguous, holding that there was "indeed only one reasonable interpretation of the terms at issue." *Laquila,* 66 F.Supp.2d at 545; *see also Allianz,* 654 F.Supp. at 18. As in *Laquila* and *Allianz,* the Court finds the Design Defect Exclusion to be unambiguous, and therefore will apply those unambiguous terms to the facts of this matter to determine whether Swire's losses are covered under the Policy.

### B. The Unambiguous Terms of the Design Defect Exclusion Exclude Coverage

As explained above, to determine whether the Design Defect Exclusion excludes coverage for Swire's claim, the Court must first determine whether Swire's claim falls within the exclusion portion of the provision, *i.e.,* whether the claim is for "loss or damage caused by fault, defect, error or omission in design, plan, or specification." If so, then the Court must determine whether the claim is excepted from the exclusion, *i.e.,* whether the claim is for "physical loss or damage resulting from such fault, defect, error or omission in design, plan or specification."

With respect to the exclusion portion of the clause, Swire's loss clearly falls within the exclusion. The language broadly excludes loss or damage caused by defective design. There does not appear to be any dispute that Swire undertook its actions in an attempt to remedy the defective design of the building. Thus, Swire's loss falls within the exclusion portion. Accordingly, the Court must determine whether Swire's loss falls within the exception to the exclusion.

As stated above, the exception portion is known as an "ensuing loss" provision. Generally speaking, an ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to *other* property wholly separate from the defective property itself. *See Laquila,* 66 F.Supp.2d at 545–46; *Allianz,* 654 F.Supp. at 18.

Although not binding, the Court finds *Laquila* to be instructive and persuasive. In that case, the insurer issued to the plaintiff (a building subcontractor) a Builder's Risk policy that excluded, among other perils, the "cost of making good faulty or defective workmanship or material," but also provided that "this exclusion shall not apply to physical damage resulting from such faulty or defective workmanship or material." The plaintiff began installing a concrete slab onto the fifth floor of a building being constructed. Shortly thereafter,

it was discovered that the concrete did not meet strength specifications. The concrete had to be removed and replaced with proper materials. This work also included shoring up the building while the defective concrete was replaced, as well as the removal and re-installation of other work on the fifth floor, such as ventilation ducts, plumbing units and electrical fixtures.

The plaintiff filed a claim with the insurer, seeking coverage for all of the costs associated with the replacement of the defective concrete. The insurer denied the claim, asserting that such costs were excluded under the policy after which the plaintiff sued. The court granted summary judgment in favor of the insurer, finding that the loss was excluded by the terms of the policy.

The court first noted that an exception to an exclusion cannot be construed so broadly that the rule (the exclusion) is swallowed by the exception. *Laquila,* 66 F.Supp.2d. at 545. The court then analyzed whether the insured's claim was covered:

> Similarly, had the fifth floor slab ... collapsed and damaged machinery, plumbing and electrical fixtures, or even neighboring property, such losses— wholly separate from the defective materials themselves—would qualify as non-excluded "ensuing losses" under the Traveler's policy. Instead, Laquila's claim for coverage here is no more than an attempt to recover for the excluded costs of making good its faulty or defective workmanship.

*Laquila,* 66 F.Supp.2d at 545; *see Allianz,* 654 F.Supp. at 17–18 (insured had "strained construction" of ensuing loss clause where insured sought coverage for cost of repairing defective concrete).

Another case that is instructive is *Schloss v. Cincinnati Ins. Co.,* 54 F.Supp.2d 1090 (M.D.Ala.1999). In *Schloss,* a homeowner who was renovating his home purchased an insurance policy which contained an exclusion for loss caused by rot, but which excepted "ensuing loss" from the exclusion. During the renovation, the insured discovered substantial rotting of the stud structure of the home. The repair of the rotting, which included replacing the rotted studs as well as removal and replacement of the roof and other finished aspects, which were not damaged, cost in excess of $500.000. The insurer denied coverage, citing the exclusion for rot, after which the insured sued.

The insured argued that the costs to repair the rotted studs, including the cost of removing and replacing the roof and other finished aspects, should be covered as an ensuing loss. The court disagreed, finding that such costs were not ensuing losses, but rather, were simply excluded losses caused by the rot:

> Reasonably interpreted, therefore, the ensuing loss clause means that if a specified uncovered loss occurs, here rot, then a separate loss which follows as a result of the specified, uncovered loss which would otherwise be covered remains covered.

> Removal and replacement of the roof and DIPS [finished aspects of the house] was done in order to correct the rot and to prevent future rot. . . . Schloss has testified in deposition that the exterior and interior walls had to be repaired in order to get to the wooden studs which had rotted. . . . These costs, are, therefore, part of the cost of repair of the rot, not a separate ensuing loss.

> \* \* \* \* \* \*

> Only if "loss" is considered to be the cost of repairing the rot does the ensuing loss provision make sense. The cost of repairing the rot is excluded from the policy because it is the loss caused by the rot, but if the rot also causes wood to fall and damage the floor, for example, then the cost of the repair for that

ensuing loss is covered.... Instead, "loss caused by rot" is the excluded cost of repair and replacement, and the ensuing loss provision can apply only if there is an additional loss. Because Schloss' interpretation renders the ensuing loss provision meaningless, the court finds that the provisions are not susceptible to the interpretation made by Schloss.

*Schloss*, 54 F.Supp.2d at 1094–96 (*citing Delray Beach*, 85 F.3d at 1536).

■ The principles that apply to *Laquila, Allianz* and *Schloss* also apply here. Essentially, Swire seeks to characterize the costs it incurred in remedying the defective design as falling within the exception for physical loss resulting from the defective design. Swire argues that the "physical loss" is the demolition of non-defective portions of the building that was required in order to correct the design defects. This characterization cannot stand. The fact that the corrections involved the demolition of non-defective portions of the building and work to shore up the building during the remediation activities does not mean that "physical loss" covered by the exception occurred. Just as the insured's damages did not fall into the exceptions in *Laquila, Allianz* and *Schloss*, Swire's damages are excluded losses caused by the defective design. This is not an instance where portions of the building (or the entire building itself) collapsed and injured other property, or even other portions of the building itself. If so, the result may have been different. In this matter, Swire's costs in remedying the defective design are precisely the types of costs that are excluded under the Design Defect Exclusion. To find otherwise would be to eviscerate the exclusion and render meaningless the terms of the exclusion, a result that is impermissible under Florida law. *See Delray Beach*, 85 F.3d at 1535. Accordingly, the Court finds that Swire's damages are excluded by the terms of the Design Defect Exclusion.

## II. The Sue and Labor Clause

Having concluded that Swire's damages are excluded by the terms of the Design Defect Exclusion, the Court must now determine what effect, if any, the Sue and Labor provision has on the availability of coverage for Swire's losses. In asserting its claim for coverage under the Sue and Labor provision, Swire sets forth two arguments. (1) the Sue and Labor Clause is a separate insuring agreement which is not subject to the Design Defect Exclusion; and (2) even if the Design Defect Exclusion applies, the Sue and Labor Clause provides coverage for Swire's expenditures because it was suing and laboring to prevent a covered loss (the collapse of the building).

■ A Sue and Labor clause is an ancient clause that addresses the mutual duties owed by an insured and an insurer. *See Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488 n. 11 (5th Cir.1960). It has been explained as follows:

A sue and labor clause makes express the implied correlative duties between insured and insurer regarding losses compensable under an insurance policy.... [T]he insured has the duty of preventing a threatened insurable loss and mitigating such loss when it does occur. An insured who avoids or minimizes insurable loss acts for the benefit of the insurer. It is the benefit conferred which creates the duty on the part of the insurer to reimburse the insured for prevention and mitigation expenses.

*Southern California Edison Co. v. Harbor Ins. Co.*, 83 Cal.App.3d 747, 148 Cal.Rptr. 106, 111–12 (1978) (internal citations omitted). *See Blasser Bros., Inc. v. Northern Pan–American Line*, 628 F.2d 376, 386 (5th Cir.1980); *Continental Food Products, Inc. v. Insurance Co. of N. Am.*, 544

F.2d 834, 837 & n. 1 (5th Cir.1977); *Reliance*, 280 F.2d at 488 n. 11; *Tillery v. Hull & Co.*, 717 F.Supp. 1481 (M.D.Fla.1988).[2]

### A. The Sue and Labor Clause is Not a Separate Insuring Agreement

■ Swire's first argument, that the Sue and Labor provision is a separate insuring agreement, can be summarily dismissed. Although certain cases have referred to a Sue and Labor provision as a "separate" insurance provision, *see, e.g., White Star S.S. Co. v. North British & Mercantile Ins. Co.*, 48 F.Supp. 808, 812–13 (E.D.Mich.1943), it is separate only in the sense that the insured's losses are not subject to deductibles or to the limits of liability set forth in the policy. *See, e.g., American Home Assur. Co. v. J.F. Shea Co.*, 445 F.Supp. 365 369 (D.D.C.1978); *Edison*, 148 Cal.Rptr. at 112 n. 6 (*citing* Appleman on Insurance). Whether sue and labor expenses are covered at all, however, is tied directly to the policy's insuring provisions. *See Continental Food*, 544 F.2d at 837 & n. 1 (sue and labor clause "is tied irrevocably to the insured perils coverage. Because the purpose of the clause is to reimburse the assured for expenses incurred in satisfying his duty to the underwriter, there is no such duty where the policy, for one reason or another, does not afford coverage. The 'sue and labor' clause does not operate as enlargement of the perils underwritten against."); *Reliance*, 280 F.2d at 488 n. 11; *Tillery v. Hull & Co.*, 717 F.Supp. 1481 (M.D.Fla.1988) (expenses incurred in mitigating damages not covered under policy are not recoverable under sue and labor clause); *Edison*,

148 Cal.Rptr. at 112 ("although the duty of reimbursement is said to be separate and supplementary to the basic insurance policy, a sue and labor clause does not extend or create coverage; the recovery under a sue and labor clause is tied irrevocably to the obligations undertaken by the insurer in the basic insurance policy").

Furthermore, the terms of the instant Policy make it clear that the Sue and Labor Clause is not a separate insuring agreement. The Policy's Insuring Agreement explicitly states that the Policy provides insurance against certain perils, "subject to the limitations, exclusions, terms and conditions contained herein." The Sue and Labor Clause is listed as paragraph 21 within the section entitled "Part D—Conditions." It is not contained within the "Coverage" section, nor does the clause contain any standard insuring agreement language. By its very terms, the Sue and Labor Clause is simply a condition of coverage, which must be read in conjunction with the Insuring Agreement, any applicable exclusions, and the remaining terms of the Policy. Accordingly, any losses that Swire suffered in suing and laboring are insured only if they were incurred with respect to a covered loss, as determined through the terms of the Insuring Agreement and the Design Defect Exclusion.

### B. The Sue and Labor Clause Does not Provide Coverage for Otherwise Excluded Perils

■ The final issue the Court must address is to what extent, if any, the Sue and

---

2. The parties disagree on whether the Sue and Labor Clause covers only mitigation damages (*i.e.*, costs incurred by the insured to minimize the amount of damages once a loss has occurred) or whether it also covers prevention damages (*i.e.*, costs incurred by the insured to prevent a loss before it has occurred). The Court need not resolve this issue, however. The law is clear, and both

parties appear to concede, that regardless of whether the costs incurred are for mitigation or for prevention, such costs must be to mitigate or prevent a *covered* loss. As explained below, because the costs that Swire incurred are excluded under the Policy, there is no coverage regardless of whether the Policy covers prevention expenses or only mitigation expenses.

Labor Clause provides coverage for Swire's expenses. Swire argues that, consistent with the purpose of the Sue and Labor Clause, its expenses should be covered because its actions primarily benefitted the insurer, by potentially preventing the collapse of the building, for which Zurich arguably would have been liable in an amount much greater then the $4.5 million in question.

The general thrust of Swire's argument is as follows: (1) in demolishing portions of the building in order to correct the detective design, Swire was suing and laboring to prevent the entire building from collapsing; (2) had the entire building collapsed, this would have been a covered loss under the Policy; (3) thus, Swire's actions constitute suing and laboring to prevent a covered loss; (4) accordingly. Swire's losses are covered under the sue and loss provision. Therefore, according to Swire, even if the means of correcting the design defect are excluded under the policy, the expenses incurred in preventing a covered loss (the collapse of the building) should be covered.

One case that directly addresses this issue is *Southern California Edison Co. v. Harbor Ins. Co.*, 83 Cal.App.3d 747, 148 Cal.Rptr. 106, 111–12 (1978). In that case, the California Court of Appeals addressed the issue of whether expenses that are excluded under the general insuring provisions of a policy are nonetheless recoverable pursuant to a sue and labor clause. The court concluded that a sue and labor clause does not provide an independent basis for coverage. *Edison*, 83 Cal.App.3d at 757–60, 148 Cal.Rptr. 106.

In Edison, the plaintiff was a consortium of utilities that had joined to construct a steam generating plant. The plaintiff purchased a builder's risk policy that contained an exclusion for correcting faulty design, as well as a sue and labor clause. During construction of the plant, due to a faulty design, the plant's foundation began settling into the earth. This settling was corrected by a process called mudjacking, in which grout was injected into the rock underneath the foundation. The mudjacking successfully corrected the settling, at a cost of almost two million dollars. The plaintiff then filed a claim with the insurer, claiming that the costs were covered under the sue and labor clause. The insurer denied the claim, after which the plaintiff sued.

After first addressing the purpose of the sue and labor clause, the court then examined whether the sue and labor clause afforded coverage for the expenses incurred by the plaintiff in remedying the defective design of the plant:

> Here, damage to the superstructure, if it had occurred, would have been an insurable loss. Notwithstanding, the means used by Edison to prevent or mitigate such damages were excluded from recovery under the policy. Edison has not cited, and our research has not disclosed, authority for the proposition that expenses excluded under the basic insurance policy are nonetheless recoverable under the sue and labor clause. The dependence of the sue and labor clause on the underlying insurance policy would suggest that Edison's claim should be rejected . . .

> Edison was under a duty to prevent and mitigate insurable loss. The effect of the sue and labor clause in that regard was only to make express that implied duty. Edison was required to take all reasonable and necessary steps to prevent or mitigate damage to the superstructure. However, it must be remembered that the only reason the superstructure was threatened was because of defects in the design of the underlying foundations. Only by correcting the design defects was Edison

able to prevent or mitigate loss to the superstructure. While loss to the superstructure was compensable under the policy, the correction of design defects was not. Mudjacking may have prevented or mitigated loss to the superstructure, but at the same time it was the means by which Edison corrected the design defects. Under this loss allocation contained in the policy, it must be said that the costs of mudjacking were not primarily for the benefit of the insurers. The benefit inuring to the insurers was only incidental.

*Edison*, 148 Cal.Rptr. at 112–13. The court therefore concluded that the expenses the plaintiff incurred in remedying the design defect were not covered by the policy.

■ The Court finds *Edison* persuasive. As the *Edison* court noted, to be covered as reimbursable sue and labor expenses, those expenditures must be made for the benefit of the insurer in mitigating or preventing a covered loss. When determining whether the insured's actions are benefitting the insurer (and thus should be covered under the Sue and Labor Clause), a court looks not to whether the insured's actions may potentially benefit the insurer in some way, but rather, whether the actions correlate to an excluded loss (in which case the sue and labor expenses do not benefit the insurer because the loss would not be covered) or correlate to a covered loss (in which case the actions benefit the insurer by reducing or eliminating the loss for which the insurer would be liable).

The actions taken by Swire included demolishing portions of the finished building in order to access and then repair the defectively designed portions of the building. Although such repairs may have helped prevent a possible collapse of the building. Swire cannot recover simply by attempting to characterize its work as for the purpose of preventing a collapse of the building. Rather, there must be a close relationship between the actions undertaken by the insured and the loss that the insured is laboring to prevent. The direct purpose of Swire's work was to repair those portions of the building that had been constructed according to a defective design. As in *Edison*, the expenditures that Swire made in remedying the design defect may have had an incidental benefit to Zurich by possibly preventing a collapse of the building at some unknown point in the future. Under Swire's theory, as long as any work done on the building may have the effect of preventing any type of covered loss, then such work would have to be covered under the sue and labor clause, regardless of whether the work would otherwise be excluded under the terms of the Policy. Swire's actions, however, were made directly and primarily to correct design defects in the building, expenses which are excluded under the terms of the policy. Therefore, Swire's expenses are not recoverable under the Sue and Labor Clause.[3]

## III. Conclusion

As there are no genuine issues of material fact, this case may be properly resolved on summary judgment. With respect to the first issue before the Court, *i.e.*, whether Swire's expenses are excluded under the terms of the Design Defect Ex-

---

**3.** Swire relies extensively upon two cases in support of its position that its expenses are covered under the Sue and Labor Clause: *Witcher Construction Co. v. St. Paul Fire & Marine Ins. Co. .*, 550 N.W.2d 1 (Minn.Ct.App. 1996) and *Wilson Bros. Bobbin Co. v. Green,*

1917 K.B. 860 (1916). Although both of these cases may support Swire's position, the cases are factually distinguishable and do not contain the detailed analysis present in *Edison,* which the Court finds most persuasive.

**1386**

clusion, the unambiguous terms of the Policy mandate a finding that Swire's loss is excluded. Swire's expenses were caused by the Condominium Project's design defects, and such expenses do not constitute physical loss resulting from the design defects. With respect to the second issue before the Court, *i.e.*, what effect, if any, the Sue and Labor Clause has on the availability of coverage for Swire's loss, the Court finds that the Sue and Labor Clause is not an independent grant of coverage, but rather, is subject to the remaining terms of the Policy, including the Design Defect Exclusion. As Swire's losses are excluded under the Policy, the Sue and Labor Clause cannot be used to circumvent the clear terms of the Design Defect Exclusion. Thus, the Policy provides no coverage for Swire's loss.

Accordingly, it is hereby ORDERED AND ADJUDGED that Plaintiff's Partial Motion for Summary Judgment (D.E.23) is DENIED and Defendant's Motion for Summary Judgment (D.E.35) is GRANTED.